## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ANDY C. OLMEDA,** | § | **CIVIL ACTION** |
| | § | |
| **Plaintiff,** | § | |
| | § | **NO. 14-1904** |
| **vs.** | § | |
| | § | |
| **CAMERON INTERNATIONAL** | § | **SECTION F** |
| **CORPORATION, PMG, INC.,** | § | |
| **d/b/a a/k/a PERSONAL MANAGEMENT** | § | |
| **GROUP d/b/a a/k/a PMG, BILLY PEREZ** | § | **JUDGE: MARTIN L.C. FELDMAN** |
| **and SCOTT CARRINGTON** | § | |
| | § | |
| **Defendants.** | § | **MAGISTRATE: MICHAEL NORTH** |

### DEFENDANT CAMERON INTERNATIONAL CORPORATION'S
### MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

This is an employment case in which Andy Olmeda ("Plaintiff") has sued Cameron International Corp. ("Cameron") and others alleging various causes of action primarily rooted in a shooting that occurred away from the workplace. The pleadings on file and the attached evidence clearly demonstrate that there are no genuine issues of material fact with respect to any of Plaintiff's claims and, accordingly, Cameron is entitled to judgment as a matter of law.

As discussed in detail below:

1. Cameron is not vicariously liable for the intentional torts because the employees were not acting within the course and scope of their employment when the tort was committed.

2. Cameron is entitled to summary judgment with respect to Plaintiff's negligence claims because (a) they are precluded by the worker's compensation bar, (b) alternatively, Plaintiff cannot establish that Cameron owed a duty to Plaintiff, and (c) alternatively, the employees' intoxicated state was the cause in fact of Plaintiff's harm.

3. Plaintiff's intentional infliction of emotional distress claim fails because Plaintiff cannot show that Cameron desired or knew that the harm facing Plaintiff was substantially certain to result.

4. Plaintiff cannot establish a *prima facie* case of race/ethnic discrimination or retaliation. Even if he could, Plaintiff cannot demonstrate that Cameron's

legitimate nondiscriminatory reason was a pretext for discrimination or retaliation.

5.     Plaintiff's ethnic harassment or hostile work environment claim fails because any alleged workplace conduct about which he complains was neither severe nor pervasive. Additionally, Plaintiff failed to report the alleged harassment as required by law. Finally, Cameron engaged in prompt remedial action by terminating Carrington.

## I.     STATEMENT OF FACTS

### A.     PLAINTIFF'S EMPLOYMENT HISTORY AT THE CAMERON BERWICK FACILITY

Plaintiff, a temporary contract employee of Defendant PMG, started working at the Cameron facility in Berwick, Louisiana as a machinist in May 2013. (Pl. Dep. at 42:10-13, 43:25-44:6, 47:10-12).  PMG is a staffing agency that supplies employees to Cameron on an as needed basis. (Pl. Dep. at 41:16-23).  At the Cameron Berwick facility, Plaintiff worked on blow-out preventers, valve bodies, couplings, and generally anything that was associated with a valve. (Pl. Dep. at 44:24-45:15).  During the workweek, PMG provided Plaintiff with a hotel room at the Best Western in Morgan City, which was five miles from the Berwick facility. (Pl. Dep. at 48:6-16).  Plaintiff was assigned to the night shift ("Second Shift"), and his regularly scheduled hours were from 4:00 p.m. to 4:00 a.m. (Pl. Dep. at 48:17-49:4).  The Cameron employee in charge of Second Shift was Angelo Cardinale who reported to Melvin Burger, the Senior Production Supervisor.[1] (Pl. Dep. at 49:16-21) (Burger Dep. at 8:1-4).

Plaintiff testified that Cameron "believed very strongly about safety and we would have safety meetings every day" at the start of each shift. (Pl. Dep. at 50:13-51:2).  After the safety meeting, Plaintiff received his tasks for the evening and went to his machine in the shop, which was a very large warehouse.  (Pl. Dep. at 51:3-52:23).

---

[1]     Plaintiff speculates that Defendant Billy Perez was a supervisor, which he was not. (Perez Dep. at 12:24-13:1) (Lambert Dec. at ¶ 5).  While Perez's title was "lead man," he did not have the power to hire, fire, discipline, give raises, promotions, or do evaluations.  (Perez Dep. at 63:13-24) (Lambert Dec. at ¶ 5).  Instead, Perez's responsibilities were only to relay instructions from Cardinale to the crew.  (Perez Dep. at 63:25-64:4, 64:25-65:2) (Lambert Dec. at ¶ 5).

B.   **PLAINTIFF'S DETAILED CHRONOLOGY OF THE EVENTS LEADING TO THE SHOOTING INCIDENT[2]**

**Monday, September 9, 2013**:  Plaintiff testified that his problems with Carrington first started on September 9, 2013 (five days before the shooting incident) during a safety meeting when he complained that the younger guys on Second Shift were leaving a mess for Cardinale to clean up. (Pl. Dep. at 57:14-58:6, 64:7-65:21 and Pl. Ex. 8 at p.4) (Tabor Ex. 1).  Plaintiff stated that his comments at that safety meeting were "the cause of the present situation spiraling out of control." (Pl. Dep. at 63:19-25 and Pl. Ex. 8 at p. 4).  At that meeting, Plaintiff stated:

> "I am frankly upset that every night when at the end of the shift I see Angelo out there picking up you all's shit, and you all should be ashamed of your asses for letting Angelo pick up after you." Then there was silence in the room.

(Pl. Dep. at 67:11-16 and Pl. Ex. 8 at p.4) (Tabor Ex. 1).  There were no problems for the remainder of that shift. (Pl. Ex. 8 to Pl. Dep. at pp. 4-5).

**Tuesday, September 10, 2013:**  Plaintiff reported to work at 4:00 p.m., and Cardinale had yet to arrive because he was attending a funeral. (Pl. Dep. at 68:16-21 and Pl. Ex. 8 at p.5). Plaintiff alleges that "this was when the harassment started." (Pl. Dep. at 68:18-21 and Pl. Ex. 8 at p.5) (Tabor Ex. 1) (emphasis added).   According to Plaintiff, a PMG employee named Thomas Bragg and some other employees started calling Plaintiff "Snorkel." (Pl. Dep. at 69:6-14 and Pl. Ex. 8 at p.5) (Tabor Ex. 1).  This was motivated by the comments he had made at the previous safety meeting, implying Plaintiff had "my head so far up [Cardinale's] ass that I needed a snorkel to breathe." (Pl. Dep. at 69:15-18 and Pl. Ex. 8 at p.5) (Tabor Ex. 1).  Plaintiff testified that the only reason he was being teased in this fashion was because his co-workers

---

[2]   Over the course of a few days after the shooting incident, Plaintiff prepared a type-written statement that he gave to law enforcement detailing the events leading up to the shooting incident.  (Tabor Aff. at ¶ 3 and Tabor Ex. 1).  The following chronology is drawn largely from Plaintiff's typewritten statement, which was subsequently confirmed in his deposition.

thought he was a suck-up or brown-noser. (Pl. Dep. at 70:8-15).  Plaintiff took this as typical

shop talk where guys just give each other a hard time. (Pl. Dep. at 69:23-70:5 and Pl. Ex. 8 at

p.5) (Tabor Ex. 1).  When Cardinale arrived around 11:30 p.m., the teasing stopped in large part.

(Pl. Dep. at 72:11-22 and Pl. Ex. 8 at p.5) (Tabor Ex. 1).

**Wednesday, September 11, 2013:**  At the start of the next workday, Second Shift held

their usual daily safety meeting.  (Pl. Dep. at 73:21-24 and Pl. Ex. 8 at p.5) (Tabor Ex. 1).

During the meeting, another employee complained that people had been yelling Snorkel the night

before.  (Pl. Dep. at 73:25-74:11 and Pl. Ex. 8 at p.5) (Tabor Ex. 1).  This was the first time that

Cardinale had heard of the issue, or even the word "Snorkel."  (Cardinale Dep. at 21:17-22:8)

(Pl. Dep. at 74:21-22 and Pl. Ex. 8 at p.5) (Tabor Ex. 1).

After speaking with Plaintiff, Cardinale informed Melvin Burger, Cardinale's direct

supervisor.  (Cardinale Dep. at 19:18-22) (Burger Dep. at 24:5-6, 139:23-140:2).  Burger spoke

with Plaintiff who said that Bragg was goading everyone else into using this term.  (Burger Dep.

at 24:8-11, 100:15-24, 140:3-24).  Burger promptly called Bragg into his office for counseling,

and instructed him to stop calling Plaintiff Snorkel and to apologize.  (Burger Dep. at 24:12-25:1,

100:23-101:15, 140:25-141:5).  Bragg agreed, and according to Plaintiff, "[i]t was behind me."

(Pl. Dep. at 112:8-18).  Burger followed up with Plaintiff the next day to confirm that Bragg had,

in fact, apologized.  (Burger Dep. at 101:16-25, 141:6-13).  Plaintiff never complained to

Cardinale again.  (Cardinale Dep. at 47:11-47:14).

**Thursday, September 12, 2013:**  Thursday, September 12, 2013, was the day before the

shooting incident.  (Pl. Dep. at 81:8-81:13).  At the start of the workday, some members of

Second Shift lined up to purchase boots from a vendor.  (Pl. Dep. at 72:23-73:7 and Pl. Ex. 8 at

p.5) (Tabor Ex. 1).  While standing in line, Plaintiff started bragging about owning luxury cars, a

multi-million dollar house and the like.[3]   (Carrington Dep. at 9:25-10:6).   Carrington was annoyed by Plaintiff and called him a "f-ing liar."  (Carrington Dep. at 9:25-10:6).  Plaintiff was offended by the comment and turned "really red."  (Carrington Dep. at 9:25-10:6, 19:13-20:4). Later when Carrington walked past Plaintiff's work station, Plaintiff told Carrington "I hope you value your life, everything you have in it, your job, because you're not going to have it soon.  It's all going to be gone soon."  (Carrington Dep. at 10:7-12, 20:6-15) (Ex. 4 to Williams Dec.). Carrington was particularly upset by the "value your life" comment because he was a war veteran.  (Carrington Dep. at 20:13-15, 26:7-20).

Later that shift, Plaintiff alleges that Carrington approached Plaintiff's machine and called him "a dumb m---er f---er."  (Pl. Dep. at 87:10-13 and Pl. Ex. 8 at pp.5-6) (Tabor Ex. 1). Plaintiff responded:

> Look Scott, you must be stupid or something. Don't you realize that this is the work place and I could bring harassment charges up against you, which you probably would lose your job, then I would sue you in civil court and then I'd be the one laughing because you're a moron.

(Pl. Dep. at 87:14-22 and Pl. Ex. 8 at p.6) (Tabor Ex. 1).  This exchange grew into an argument, which culminated in the first alleged "threat" by Carrington.  (Pl. Dep. at 88:6-89:2 and Pl. Ex. 8 at p.6) (Ex. 4 to Williams Dec.).  Plaintiff left work early that night, so there were no other confrontations or issues that shift.  (Pl. Dep. at 89:21-24 and Pl. Ex. 8 at p.6) (Tabor Ex. 1).

**Friday, September 13, 2013:**  When Plaintiff reported to work at 4:00 p.m., he saw Carrington briefly across the shop.  (Pl. Dep. at 93:20-94:18 and Pl. Ex. 8 at p.6) (Tabor Ex. 1). Around 8:00 p.m., Carrington and Perez took a half day of vacation and left eight hours prior to their normal departure time.  (Perez Dep. at 33:22-25).  Perez and Carrington first went to Twin

---

[3]   Plaintiff often boasted about living an extravagant lifestyle (like having a multi-million dollar home and a Lamborghini) and having celebrities (such as "Slash" – the former lead guitarist of the rock band Guns N' Roses) over to his house and using cocaine.  (Perez Dep. at 79:2-24) (Burger Dep. at 53:1-22) (Cardinale Dep. at 49:2-8).

Peaks where they drank heavily, and then to "Rickochet Billiards" (a pool hall) in Houma where they got very drunk over the course of the next several hours.  (Perez Dep. at 67:16-24) (Carrington Dep. at 29:7-30:18, 31:6-17).  The first time Perez and Carrington discussed doing anything about Plaintiff was <u>after</u> they were intoxicated the night of the shooting.  (Perez Dep. at 36:6-11, 65:9-21) (Carrington Dep. at 32:14-16, 75:20-23).  In their drunken state, they decided it would be a good idea to find Plaintiff and fire a shotgun in the vicinity of his truck to frighten him.  (Perez Dep. at 22:1-5, 50:4-10) (Carrington Dep. at 17:15-18:4, 79:20-80:3).

Plaintiff finished his shift and left at 4:00 a.m. early Saturday morning, which was his normal departure time.  (Pl. Dep. at 98:23-99:2 and Pl. Ex. 8 at p.6)  (Tabor Ex. 1).  Plaintiff planned to go to his house in Mandeville for the weekend.  (Pl. Dep. at 60:9-13).  Plaintiff initially went to his hotel, took a shower and packed.  (Pl. Dep. at 100:1-6 and Pl. Ex. 8 at p.6) (Tabor Ex. 1).  Plaintiff then met a friend at the Wal-Mart in Morgan City at 5:00 a.m. to pick up a cat to take with him.  (Pl. Dep. at 58:7-17, 100:7-15 and Pl. Ex. 8 at p.6) (Tabor Ex. 1). Finally, Plaintiff filled his truck with gas and started down Highway 90 toward Mandeville.  (Pl. Dep. at 100:10-15 and Pl. Ex. 8 at p.6) (Tabor Ex. 1).

While Plaintiff was preparing to leave town, Perez and Carrington were looking for him and believe they first saw him on the road after Plaintiff had left the Cameron facility.[4]  (Perez Dep. at 22:1-23:6) (Carrington Dep. at 35:14-35:20).  Perez and Carrington waited for Plaintiff at the hotel while he showered and followed him to the Morgan City Wal-Mart.  (Perez Dep. at 66:11-22).  After driving approximately 30 miles on Highway 90, Perez pulled behind Plaintiff, and Carrington shot in the vicinity of Plaintiff's truck accidentally hitting it.  (Pl. Dep. at 101:16-102:21 and Pl. Ex. 8 at pp.6-7) (Tabor Ex. 1) (Perez Dep. at 46:6-47:1, 49:23-50:3, 67:1-15).

---

[4]     This is consistent with what they told law enforcement.  (Tabor Aff. at ¶ 7).

Carrington testified that he only meant to shoot towards the woods to scare Plaintiff, not actually hit the vehicle.  (Carrington Dep. at 17:25-18:4, 44:19-21) (Perez Dep. at 80:14-21).

After Carrington and Perez sped off, Plaintiff pulled into a nearby Burger King parking lot.  (Pl. Dep. at 102:25-103:5 and Pl. Ex. 8 at p.7) (Tabor Ex. 1).  Plaintiff called Cardinale informing of what had just happened, and Cardinale told him to call the police.  (Cardinale Dep. at 31:4-17).  Plaintiff also left Burger a voicemail.  (Burger Dep. at 58:15-18).  When Burger received Plaintiff's message, he immediately notified his supervisor (Duane Carriere), the Human Resources Manager (Kelly Lambert), and the PMG liaison (Erich Heitman).  (Burger Dep. at 58:18-59:1, 70:2-8).

Cameron immediately suspended Carrington and Perez pending an investigation.  (Lambert Dec. at ¶ 6)  (Burger Dep. at 42:25-43:15).  Put simply, Cameron considered this to be a police matter and wanted to give law enforcement the opportunity to complete its criminal investigation.  (Lambert Dec. at ¶ 6) (Burger Dep. at 117:19-23).  PMG, Plaintiff's employer, decided to remove Plaintiff from the Cameron facility following the incident as well.  (Lambert Dec. at ¶¶ 6, 8, 11, 16) (Burger Dep. at 106:21-107:21, 123:20-124:15).

When Cameron first learned of the shooting, no one was sure what had happened; therefore, Burger talked with the members of Second Shift as they reported to work on Saturday – the day of the incident.  (Burger Dep. at 42:25-43:15, 71:16-72:13) (Ex. 6 to Williams Dec.).  Burger heard a wide variety of stories and theories about what might have transpired.  (Burger Dep. at 42:25-43:15, 71:16-72:13) (Ex. 6 to Williams Dec.).  Earlier in the day, Bragg emailed Burger and told him that he had "info I think you need."  (Burger Dep. at 83:21-84:2) (Ex. 3 to Williams Dec.).  When Burger met with him, Bragg prepared a written statement about the argument that had occurred between Plaintiff and Carrington the day before the shooting

incident. (Burger Dep. at 84:5-9) (Ex. 4 to Williams Dec.).  In his statement, Bragg states:

> On 9-12-13, I was approached by Andy Olmeda and told about a confrontation between himself and Scott Carrington. Andy told me that Scott had approached Andy's area to get some holding clamps from a cabinet. According to Andy, Scott had called him a dumb shit.  Andy then told Scott that he should shut the f--- up or that he (Andy) would own Scott's truck, his house, everything, and that Scott would be working for Andy for the rest of his life. And that Scott would not have a job anymore. I do not know what Scott's response was to Andy, other than when Scott came to my machine and told me what had happened.  All Scott said about it was that Andy could get a brick thru his windshield.  At no time did Scott threaten to kill or harm Andy.

(Ex. 4 to Williams Dec.) (Burger Dep. at 25:6-21).

On Monday, September 16, 2013, (the next workday after the shooting incident) Cameron was notified by law enforcement that Perez and Carrington admitted firing a weapon in the vicinity of Plaintiff's vehicle.[5]  (Lambert Dec. at ¶ 9) (Burger Dep. at 43:16-20, 139:15-22). Upon learning this information, Cameron immediately terminated Perez and Carrington. (Lambert Dec. at ¶ 9) (Burger Dep. at 43:16-20, 139:15-22).  PMG had already pulled Plaintiff and set up a replacement, so Plaintiff never returned to work at the Cameron Berwick facility. (Lambert Dec. at ¶ 11) (Burger Dep. at 106:18-107:20).

Detective Blake Tabor, the primary detective for the criminal investigation, provided the following sworn testimony with respect to this event:

> When I was at the scene **I interviewed Mr. Olmeda and asked him to take a few days to prepare a detailed statement of what had transpired, including anything and everything leading up to the incident, what may have motivated the incident and anything else he felt was important.** Mr. Olmeda prepared a typed statement, which is attached as Exhibit 1 to this Affidavit. … I subsequently copied the contents of Mr. Olmeda's typed statement into the narrative, which is attached as Exhibit 2.
> …
> During the course of my interview with Mr. Olmeda and subsequent

---

[5]    Perez and Carrington both pled guilty to aggravated criminal damage to property and Carrington pled guilty to illegal discharge of a firearm.  (Perez Dep. at 11:20-12:1) (Carrington Dep. at 47:8-19).

investigation, **Mr. Olmeda never mentioned anything about race or ethnicity being part of any issues involving Scott Carrington and Billy Perez, Jr.,** ….   Had Mr. Olmeda made any reference or indication whatsoever that race or ethnicity was involved or may have played a role, I would have noted that and reported it because we are required by the Federal Bureau of Investigation to track any racial bias or ethnic bias incidents. Additionally, there is an enhancement for crimes that involve race or bias.  I had a wide degree of latitude in deciding what charges to initially lodge against Mr. Carrington and Mr. Perez and **I made the determination that the lesser charge of Aggravated Criminal Damage to Property was appropriate instead of assault or attempted murder …. Had I had any indication that race or ethnic bias was involved, I would have charged Mr. Carrington and Perez with a more serious crime.**

… **I informed Mr. Olmeda that he needed to make better choices because it was apparent that he engaged in unnecessary, confrontational verbal altercations with Mr. Carrington** and that Mr. Olmeda had unnecessarily exacerbated the situation as a result. …

(Tabor Aff.) (emphasis added).

## II.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio.,* 475 U.S. 574, 586 (1986). A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

## III.   ARGUMENT AND AUTHORITIES

Because, as the Court has previously noted, "Olmeda's 'causes of action' are inartfully drafted, to say the least," (Dkt. No. 11 at 7, n. 6), Cameron requested that Plaintiff and his counsel clarify the claims they are pursuing against Cameron.  They are:

1) Vicarious liability for assault and battery under La. Civ. Code art. 2315 and 2320;

2) Negligent screening, hiring, and supervision under La. Civ. Code art. 2315 and 2320;

3)  Intentional and negligent infliction of emotional distress; and

4)  Ethnic discrimination, harassment and retaliation under Title VII.[6]

(Pl. Dep. at 20:13-25:13 and Pl. Ex. 2-3).  Cameron is entitled to judgment as a matter of law on

and each and every one of Plaintiff's causes of action.

### A.  CAMERON IS ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF'S VICARIOUS LIABILITY CLAIMS

Plaintiff asserts that Cameron is liable for the assault and battery committed by

Carrington and Perez alleging that it was a "workplace related shooting" and "arising out of the

workplace."  (Answer to Interrogatory No. 3 attached as Ex. 2 to Pl. Dep.).  Louisiana case law

has made clear, however, that Cameron is not responsible for the acts committed by its

employees that are not within the course and scope of their employment.

"Vicarious liability rests in a deeply rooted sentiment that a business enterprise cannot

justly disclaim responsibility for accidents which may fairly be said to be characteristic of its

activities." *Richard v. Hall*, 2003–1488 (La.4/23/04), 874 So.2d 131, 138 (emphasis added).  An

employer's vicarious liability for conduct which is not its own, however, extends only to the

employee's tortious conduct that is within the course and scope of employment. *Kelley v. Dyson*,

10–61 (La.App. 5 Cir. 5/25/10), 40 So.3d 1100, 1105.  The term "course" refers to the time and

place that the conduct occurred, while "scope" examines the employment-related risk of injury.

*Baumeister v. Plunkett*, 95–2270 (La.5/21/96), 673 So.2d 994, 996.

In *Baumeister v. Plunkett*, 95-2270 (La.5/21/96), 673 So.2d 994, the Louisiana Supreme

Court reviewed "whether the court of appeals correctly held a hospital vicariously liable for the

sexual battery committed by one of its supervisors upon a co-employee during working hours on

---

[6]  Plaintiff and his attorney stated on the record in Plaintiff's deposition and in his interrogatory responses that he is only pursuing federal claims, and not state law claims for discrimination or retaliation.  (Plaintiff's Dep. at 21:25-23:21).

the hospital's premises." *Id.* at 995 (emphasis added). The court stated:

> An employer is not vicariously liable merely because his employee commits an intentional tort on the business premises during working hours. Vicarious liability will attach in such a case only if the employee is acting within the ambit of his assigned duties and also in furtherance of his employer's objective.

*Id.* at 996 (internal citations and quotations omitted) (emphasis added). The Court articulated a four part test: (1) whether the tortious act was primarily employment rooted; (2) whether the act was reasonably incidental to the performance of the employee's duties; (3) whether the act occurred on the employer's premises; and (4) whether the act occurred during the hours of employment. *Id.* at 996–97 (citing *LeBrane v. Lewis,* 292 So.2d 216, 218 (La.1974)).

Applying these factors and reversing the court of appeals, the *Baumeister* court held that even though the sexual assault occurred on the employer's premises and during the hours of employment, there was no vicarious liability because the tortious act was not primarily employment rooted and the assault was not reasonably incidental to the performance of official duties. *Id.* at 999–1000. The court noted that "a nursing supervisor's responsibilities do not include sexually oriented physical contact with a co-employee." *Id.* at 999. Nor was it "foreseeable from the perspective of the hospital that such conduct will take place on hospital premises during working hours." *Id.* The court ultimately concluded that "[the] sexual assault was entirely extraneous to [the] employer's interests." *Id.* at 1000.

Similarly, in *Winstel v. City of Shreveport,* 2013 WL 4888614 (W.D.La. 2013), the plaintiff was sexually assaulted by the Assistant Chief Administrative Officer for the City of Shreveport. *Id.* at *1. The plaintiff sued the employer alleging vicarious liability for the intentional torts committed by the perpetrator. *Id.* at *1-2. After analyzing *Baumeister,* the court noted that while the sexual assault took place on the employer's premises, it was not during regular business hours. *Id,* at *6. The court held that the plaintiff had failed to show how the

actions of the perpetrator "were incidental to or motivated in any way by his employment duties with the City." *Id.* Put simply, there was no evidence that

> Seaton's actions were activated at least in part by a purpose to serve his employer. Rather, his actions were completely extraneous and were in no way incidental to his duties as the City's Assistant Chief Administrative Officer.

*Id.* The Court ultimately found that there was no evidence that "Seaton's actions could plausibly be construed as an act in furtherance of any objective of the City" and as a result, the plaintiff's vicarious liability claims were dismissed. *Id.*

The Louisiana case with perhaps the most similar fact pattern to the instant case is *Kelley v. Dyson*, 40 So.3d 1100, 10-61 (La.App. 5 Cir. 5/25/10).[7] In *Kelley,* the plaintiff brought claims for negligence and vicarious liability against his employer, Weber Marine, for an assault committed by a fellow employee – Shaun Dyson – that occurred away from work and after hours. The plaintiff alleged that Dyson had been in several fights, including one that occurred during his employment with Weber Marine. After this fight, Dyson started to harass the plaintiff both verbally and physically in the workplace. The plaintiff complained to Weber Marine about this harassment, but Weber Marine did not terminate Dyson. Dyson used a steel toed boot to kick and break the plaintiff's ankle. "The plaintiff contends that but for Weber's retaining Dyson despite the plaintiff's complaints, and the forced association between Kelley and Dyson, this incident would not have occurred." *Kelley v. Dyson*, 10 So.3d 283, 08-1202, at *6 (La.App. 5 Cir. 3/24/09). The court of appeals affirmed the trial court's dismissal of the plaintiff's claims but remanded the case to give the plaintiff an opportunity to amend. *Id.* at *8.

---

[7]  There are two appellate opinions in the *Kelley* case. The trial court initially dismissed the entire case and on appeal, the appellate court affirmed the trial court but remanded with instructions to permit plaintiff to amend. *Kelley v. Dyson,* 10 So.3d 283 (La.App. 5 Cir. 3/24/09). On remand, the plaintiff amended his pleading, however, the trial court dismissed the case a second time. *Kelley v. Dyson*, 40 So.3d 1100, 10-61 (La.App. 5 Cir. 5/25/10).

On remand, the plaintiff added that the fight Dyson had engaged in while in the employ of Weber Marine involved Dyson kicking a tug boat captain in the ankle with a steel toed boot and jumping on him after he fell.  *Kelley*, 40 So.3d at 1103.  Weber Marine required Dyson to wear steel toed boots.  *Id.*  Weber Marine did not terminate Dyson after being informed of the fight and other fights involving Dyson.  *Id.* at 1104.  Additionally, Dyson allegedly pushed, bumped and screamed at the plaintiff on the worksite the day of the incident.  *Id*.

The trial court dismissed the plaintiff's claims, and on appeal, the *Kelley* court affirmed:

> the assault was not employment rooted or incidental to the performance of Dyson's duties. <u>Weber had no duty to protect Kelley from an intentional act committed by a co-employee after hours, off the worksite, and which did not occur in the course and scope of employment</u>.

*Id.* at 1106 (citations omitted) (emphasis added); *see also  Crawford v. Wal–Mart Stores, Inc.,* No. 10–805, 2011 WL 3206196 (M.D.La. July 27, 2011).

### <u>Applying the foregoing principles to the instance case.</u>

It is clear that neither Carrington nor Perez were acting within the course and scope of their employment when they shot at Plaintiff's vehicle.  First, the tortious act was not employment rooted as explained in the foregoing cases.  The dispute between Carrington and Plaintiff was personal in nature.  Carrington made clear that he was motivated by the fact that Plaintiff had bragged about his extravagant lifestyle, been generally obnoxious, and warned Carrington he would take everything Carrington owned, his life, his property and his job. (Carrington Dep. at 9:25-10:12, 20:6-15, 26:7-20).  Additionally, Carrington and Perez were heavily intoxicated at the time of the incident.  (Carrington Dep. at 71:14-72:15, *see also* 17:25-18:4, 33:14-34:15, 38:16-18) (Perez Dep. at 81:21-82:5, 82:19-21, *see also* 14:11-19, 18:24-19:22, 39:12-15, 67:25-68:6, 68:10-68:22).

Nor were the tortious acts reasonably incidental to the performance of Carrington's or

13

Perez's official duties.  Plaintiff cannot credibly argue that a machinist's responsibilities include getting drunk, working with a shotgun, or shooting at someone's vehicle.  To the contrary, Carrington's and Perez's actions were "entirely extraneous to [Cameron's] interests." *Baumeister,* 673 So. 2d at 1000.  Plaintiff cannot produce any evidence demonstrating that Carrington's and Perez's "actions were activated at least in part by a purpose to serve [Cameron]. Rather, [their] actions were completely extraneous and were in no way incidental to [their] duties as [machinists]." *Winstel,* 2013 WL 4888614, at *6.

It is also undisputed that the shooting incident occurred <u>after working hours and away from Cameron's premises</u>.  This is dispositive.  In fact, the shooting incident occurred over nine hours after Carrington and Perez left work that afternoon, and almost two hours after Plaintiff had left work <u>for the weekend</u>.  (Pl. Dep. at 60:10-61:22, 103:14-21 and Pl. Ex. 8 at p.7). Additionally, the incident occurred over 30 miles away from Cameron's Berwick facility after Plaintiff had made several stops in preparation for, and had begun, his trip to Mandeville.  (Pl. Dep. at 61:14-22 and Pl. Ex. 9).

Cameron clearly cannot be vicariously liable for the intentional acts committed by Carrington and Perez.  As the Louisiana Supreme Court has made clear, "[v]icarious liability will attach in such a case only if the employee is acting within the ambit of his assigned duties and also in furtherance of his employer's objective."  *Baumeister,* 673 So.2d at 996.  Here, there can be no credible argument that they were.  Further, Carrington and Perez's actions occurred after hours and away from Cameron's facility.  Thus, Cameron is entitled to judgment as a matter with respect to all of Plaintiff's claims for vicarious liability.

14

### B.    CAMERON IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S NEGLIGENCE CLAIMS

### 1.    Plaintiff's negligence claims against Cameron are precluded by the worker's compensation bar

Plaintiff alleged various causes of action arising in negligence against Cameron, including negligent screening, hiring, and supervision as well as negligent infliction of emotional distress.  All of Plaintiff's negligence claims against Cameron are barred by the exclusivity provision of the Louisiana Worker's Compensation Act, La. R.S. § 23:1032.

Under La. R.S. § 23:1032(A)(1)(a), an injured employee is limited  to the remedies available under the Workers' Compensation Act to the exclusion of all others.  *Sanchez v. Harbor Construction Co., Inc.,* 2007-0234 (La. App. 4 Cir. 10/3/07); 968 So. 2d 783.  Further, a borrowed employee is barred from bringing a negligence action against either his general <u>or borrowing employer</u> (such as Cameron in this case).[8]  *Sanchez*, 968 So. 2d at 787.

Whether a borrowed-servant relationship exists is a question of law for the judge to decide. *Fanguy v. Dupre Brothers Construction Company, Inc.,* 588 So.2d 1251, 1257 (La.App. 1st Cir.1991), writ denied, 594 So.2d 892 (La.1992).  Courts consider nine factors in making this determination: 1) Who has control over the employee and the work he is performing? 2) Whose work is being performed? 3)  Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer? 4) Did the employee acquiesce in the new work situation? 5)  Did the original employer terminate his relationship with the employee? 6) Who furnished tools and place for performance? 7) Was the new employment over a considerable length of time? 8)  Who had the right to discharge the employee? 9)  Who had the obligation to pay the employee? *Sanchez*, 968 So. 2d at 786 (citations omitted).

---

[8]    Olmeda was covered by workers compensation insurance during the entire period in question. (Williams Dec. at ¶ 3 and Williams Ex. 2).

Applying the foregoing factors to the instant case, Cameron generally had control over Plaintiff while he was at the Berwick facility.  (Burger Dep. at 11:24-12:10).  The work was being performed for Cameron.   (Pl. Dep. at 44:24-45:15).   PMG provided Cameron with temporary labor as requested by Cameron, and Cameron, in return, paid PMG in accordance with the terms of the Master Staffing Services Agreement.  (Lambert Dec. at ¶ 13) (Williams Dec. at ¶ 3 and Williams Exhibit 1). Plaintiff, a temporary contract employee, acquiesced to the work situation.   Cameron did not terminate its relationship with Plaintiff.  (Lambert Dec. at ¶ 13). Cameron supplied the machine from which Plaintiff worked at Cameron's facility.  (Burger Dep. at 12:11-23).  Plaintiff was employed at the Cameron Berwick facility for six months.  (Lambert Dec. at ¶ 13).  Cameron retained the right to have PMG employees removed although it did not do so in this circumstance.  (Lambert Dec. at ¶ 13) (Burger Dep. at 119:8-18).  PMG had the obligation to pay Plaintiff.  (Lambert Dec. at ¶ 13).  Plaintiff worked under the direction of and alongside Cameron employees.  (Lambert Dec. at ¶ 13)  (Burger Dep. at 11:22-12:10).

Accordingly, Plaintiff was a borrowed employee of Cameron for purposes of the Workers' Compensation Act, and as a result, all of his negligence claims against Cameron are barred by its exclusivity provisions and must be dismissed as a matter of law.  *See Roscoe v. Hastings,* 43,942 (La. App. 2 Cir. 1/14/09); 999 So. 2d 1218, 1220; *Bourgeois v. Curry*, 05–0211 (La.App. 4 Cir. 12/14/05), 921 So.2d 1001, 1010 (dismissing claims for negligent infliction of emotional distress).

### 2.   Alternatively, Plaintiff's negligence claims fail because Cameron did not owe a duty to Plaintiff

Alternatively, if any of Plaintiff's negligence claims are not precluded by the workers' compensation bar, Plaintiff's claims must be dismissed because Cameron did not owe a duty to Plaintiff.  To prevail on a negligence claim under La. Civil Code art. 2315, Plaintiff must prove

16

five separate elements: (1) Cameron had a duty to conform his conduct to a specific standard; (2) Cameron failed to conform its conduct to the appropriate standard; (3) Cameron's substandard conduct was the cause-in-fact of the plaintiff's injuries; (4) Cameron's substandard conduct was a legal cause of the plaintiff's injuries; and, (5) actual damages. *Brown v. Lee,* 94–104 (La.App. 5 Cir. 7/13/94), 639 So.2d 897, 898–899.   A claim against an employer for the torts of an employee based on the employer's alleged direct negligence in hiring, retaining, or supervising the employee generally is governed by the same duty-risk analysis used for all negligence cases in Louisiana. *Griffin v. Kmart Corp.,* 00–1334, p. 6 (La.App. 5 Cir. 11/28/00), 776 So.2d 1226, 1231.   When an employer hires an employee who in the performance of his duties will have a "unique opportunity" to commit a tort against a third party, he has a duty to exercise reasonable care in the selection of that employee. *Id.*

In *Kelley v. Dyson,* discussed in detail *supra* at 12-13*,* the court of appeals also affirmed the dismissal of the plaintiff's negligence claims.   On the first appeal, the court held:

> Here, however, there is no allegation that employment by Weber gave Dyson a **unique opportunity** to inflict harm on the plaintiff. … **Hence, there is nothing to establish a duty on Weber's part to protect the plaintiff from the particular harm that occurred.**

*Kelley*, 10 So.3d 283 at *7 (emphasis added).   After the plaintiff amended his complaint on remand, the trial court dismissed the case once again.   In affirming the second dismissal of the plaintiff's case, the court of appeals noted:

> neither the requirement that the employees wear steel toed boots on the job, nor the failure to fire Dyson were "unique opportunities to commit a tort" against Kelley. The assault at work [against the tug boat captain] alleged in the petition was committed against another employee, and there is no claim that Kelley was involved in that action.

*Kelley*, 40 So.3d at 1105.   In finding no duty existed, the court reiterated that the assault "took place after work and off the jobsite." *Id.*   (emphasis added).

In this case, there is no evidence that Cameron provided Carrington or Perez a "unique opportunity" to commit a tort against Plaintiff.  While the assailant in *Kelley* had a history of violence and had been in a prior fight at work, there is no such allegation in this case.  (Pl. Dep. at 150:16-25).  No one ever laid a hand on Plaintiff in the Cameron facility.  (Pl. Dep. at 157:10-158:1).  The tort took place away from work, after hours on the weekend, and Carrington and Perez both admitted to being heavily intoxicated at the time.  Neither of them were expected to interact with Plaintiff whatsoever after they left work for the weekend.  Put simply, Cameron does not have a duty to control its employees on the weekend and away from the facility.  As a result, Cameron is entitled to judgment as a matter of law with respect to all of Plaintiff's negligence claims.

### 3.   Alternatively, Carrington's and Perez's intoxicated condition was the cause in fact of Plaintiff's harm

Even assuming that Plaintiff's negligence claims are not precluded by the workers compensation bar and that Cameron owed a duty to Plaintiff, the undisputed summary judgment evidence demonstrates that the cause in fact of Plaintiff's harm was the heavily intoxicated state of Carrington and Perez.

"Negligence is actionable only when it is a proximate cause of the damage claimed." *Fabre v. B.F. Goodrich Co.,* 218 So.2d 617, 620 (La.App. 4 Cir. 1969).  Proximate cause is cause which immediately precedes and produces the effect, as distinguished from remote, mediate, or predisposing cause. *Beard v. Coregis Insurance Co.,* 968 So.2d 178 (La.App. 3 Cir. 10/17/07). The Louisiana Supreme Court has stated that, "[w]here there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident." *Perkins v. Entergy Corp.,* 00-1372, pp. 7-10 (La.3/23/01), 782 So.2d 606, 611.  When an independent, intervening act is the proximate cause of the harm, an

earlier act of negligence is not the proximate cause.  *Fabre,* 218 So.2d at 620.

In this case, Carrington and Perez both testified that the incident would not have occurred if they had not been drunk at the time.  Perez testified that he had no issues with Plaintiff prior to the incident and that the reason why he went along with this "stupid idea" was because he was "heavily intoxicated."  (Perez Dep. at 14:11-19, 18:24-19:22).  In fact, Perez testified that this would not have happened if they had not been drunk.  (Perez Dep. at 68:10-68:22, 81:21-82:5, 82:19-21).  Carrington testified similarly.  (Carrington Dep. at 72:11-15).

The foregoing demonstrates that any alleged negligence by Cameron was not the proximate cause of the harm about which Plaintiff complains.  When Carrington and Perez left Cameron that night, they decided to get drunk.  Both of them testified that the incident would not have occurred had they not been intoxicated.  That state of intoxication was an intervening cause of the harm alleged.  As a result, Cameron is entitled to judgment as a matter of law with respect to Plaintiff's negligence claims.

## C.  CAMERON IS ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Cameron is also entitled to summary judgment on Plaintiff's claim of intentional infliction of emotional distress.  An action for intentional infliction of emotional distress consists of three elements: (1) the conduct of the defendant was extreme and outrageous; (2) the emotional distress suffered by the plaintiff was severe; and (3) the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his (its) conduct.  *Lawson v. Straus*, 98-2096, p. 8 (La.App. 4 Cir. 12/8/99), 750 So.2d 234, 240.  "Unlike an action grounded in negligence, an action sounding in intentional tort causes us to focus on whether the employer desired or knew that the harm facing the plaintiff as a result of the complained-of conduct was substantially certain to result from the conduct."

*Bourgeois,* 921 So.2d at 1010.  In the present case, Plaintiff cannot produce competent summary judgment evidence demonstrating that Cameron desired or knew that the harm facing Plaintiff was substantially certain to result.  Even Plaintiff testified that he was "shocked" that it had gone that far.  (Pl. Dep. at 102:22-24).  As a result, Cameron is entitled to judgment as a matter of law.

      **D.**    **CAMERON IS ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF'S RACE/ETHNIC DISCRIMINATION CLAIMS**

Cameron is entitled to summary judgment with respect to Plaintiff's claims for racial/ethnic discrimination because he cannot make out *prima facie* case of discrimination.  The burden of proof for a Title VII claim is well-settled.  Plaintiff must first establish a *prima facie* case that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) he was replaced by someone outside the protected class, or, show that others similarly situated were treated more favorably.  *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.,* 245 F.3d 507, 512–13 (5th Cir. 2001).  If Plaintiff establishes a *prima facie* case, the burden of production shifts to Cameron to assert a legitimate nondiscriminatory reason for the termination. *Id.* at 513.  Once Cameron meets this burden, Plaintiff must show that the given reason is a pretext for unlawful discrimination. *Id.*

In this case, there is no summary judgment evidence that Plaintiff was replaced with a person outside of the protected class, or that he was treated less favorably than similarly situated employees of a different ethnicity.  *Merritt v. United Parcel Service,* 321 Fed. Appx. 410, 413-14 (5th Cir. 2009).  Without such evidence, Plaintiff cannot prove the fourth element of his *prima facie* case of race/ethnic discrimination, and Cameron is entitled to judgment as a matter of law.

      **E.**    **CAMERON IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM**

Cameron is also entitled to summary judgment on Plaintiff's retaliation claim because he

cannot establish a *prima facie* case. A *prima facie* case of retaliation under Title VII requires proof that (1) he participated in protected activity, (2) he suffered an adverse employment action, and (3) there is a causal connection between the protected activity and the adverse action. *Stewart v. Miss. Trans. Comm'n,* 586 F.3d 321, 331 (5th Cir. 2009).

In the present case, Plaintiff did not engage in protected activity.[9] Plaintiff testified that the only person who allegedly used racial language against him at Cameron was Carrington:

Q.   Well, tell me who you were aware of that were calling you -- or were calling you racial slurs?

A.   Scott Carrington.

Q.   Anyone else?

A.   No.

(Pl. Dep. at 208:8-13). The first time that Carrington allegedly made a racial comment to Plaintiff was in the days just prior to the shooting. (Pl. Dep. at 81:17-19). Importantly, Plaintiff testified that he never reported Carrington for harassment; rather, he "threatened to" as he told his doctors on multiple occasions. (Pl. Dep. at 138:4-140:7 and Pl. Ex. 13-14). Also, when Plaintiff confronted Carrington the day before the shooting, he testified that he told Carrington that he "could" bring harassment charges against him, so it is evident that he had not at that point. (Pl. Dep. at 87:14-22 and Pl. Ex. 8 at p.6) (Tabor Ex. 1). Lambert and Burger testified that they never heard Plaintiff allege that anyone had used racial language. (Burger Dep. at 125:4-17) (Lambert Dec. at ¶¶ 15, 17). Accordingly, Plaintiff cannot establish an essential element of his *prima facie* case – that he engaged in protected activity.

Even assuming that Plaintiff engaged in protected activity, there is no evidence of a

---

[9]   While Plaintiff complained about being called "Snorkel," Cameron responded with Burger counseling Bragg. (Burger Dep. at 24:12-25:1, 100:23-101:25, 140:25-141:13). Of course, Snorkel is not a racial term; rather, it just means that someone is attempting to curry favor with a supervisor. (Pl. Dep. at 70:8-15). This was not protected activity under Title VII.

causal connection between the alleged protected activity and the adverse action.  In this case, Plaintiff speculates that Cameron asked for Plaintiff to be terminated, however, when asked who at Cameron made this request, Plaintiff testified "I don't know."  (Pl. Dep. at 158:22-159:3). Accordingly, Plaintiff cannot establish that the person who allegedly made the request (which Cameron denies) knew that Plaintiff engaged in any alleged protected activity.

### F.   CAMERON'S LEGITIMATE NON-DISCRIMINATORY BUSINESS REASON

Even if Plaintiff could prove a *prima facie* case of ethnic discrimination or retaliation, Cameron has articulated a legitimate, non-discriminatory business reason for the adverse action in this case.  That is, Cameron did not make the decision to discharge Plaintiff.  There can be no discrimination or retaliation if Cameron did not make or influence the decision.  The record shows that PMG removed Plaintiff from the Cameron facility after learning of the shooting incident.  (Ex. 8 to Williams Dec.) (Ex. 3 to Burger Dep.) (Lambert Dec. at ¶¶ 6, 8, 11, 16). PMG set up a replacement for Plaintiff pending the investigation of the event.  (Ex. 8 to Williams Dec.) (Pl. Dep. at 220:17-221:7) (Lambert Dec. at ¶¶ 8, 11, 16).  Cameron neither asked nor instructed PMG to replace Plaintiff.  (Lambert Dec. at ¶ 16) (Burger Dep. at 51:6-12). As a result, Plaintiff cannot demonstrate that ethnic or retaliatory animus on Cameron's part was the reason that Plaintiff no longer works at the Cameron facility.  *Turner v. Kansas City Southern Ry. Co.,* 675 F.3d 887, 902 (5th Cir. 2012) (Plaintiff "must prove that the actual decisionmaker was motivated by race in taking the adverse employment action.") (emphasis added).

Additionally, no one at Cameron knew or believed that Plaintiff was Hispanic or that he had engaged in any protected activity.  When PMG forwarded Plaintiff's vital statistics to Cameron as he was onboarding, PMG represented that Plaintiff was white.  (Ex. 9 to Williams Dec.) (Lambert Dec. at ¶ 17).  Put simply, there is no evidence that anyone who could have made a decision to remove Plaintiff from Cameron (Melvin Burger or Kelly Lambert) believed or

knew that Plaintiff was anything other than white.  (Lambert Dec. at ¶ 17) (Burger Dep. at 138:23-139:1).   As a result, even assuming Cameron played a role in the decision to remove Plaintiff from the worksite, Plaintiff cannot demonstrate that racial animus on Cameron's part was the reason that Plaintiff no longer works at the Cameron facility.

Likewise, there is no evidence that any purported decisionmaker at Cameron had any knowledge that Plaintiff engaged in protected activity.  Plaintiff has never identified who Cameron's alleged decisionmaker was, much less provide evidence that they knew about any protected activity.  Without such evidence, Plaintiff cannot establish pretext for his retaliation claim.  *Manning v. Chevron Chem. Com.,* 332 F.3d 874, 883 n.6 (5th Cir. 2003) (Plaintiff was required to produce "at least some evidence that the decision makers had knowledge of [her] protected activity.").

In light of the foregoing, Plaintiff cannot establish that Cameron's legitimate nondiscriminatory reason is a pretext for race/ethnic discrimination or retaliation.  As a result, Cameron is entitled to judgment as a matter of law for these claims.

### G.   CAMERON IS ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF'S ETHNIC HARASSMENT CLAIMS

Plaintiff's final claim of a racially hostile work environment also fails as a matter of law. The elements of a *prima facie* case of a hostile work environment are: (1) membership in a protected group; (2) harassment (3) based on a factor rendered impermissible by Title VII; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment yet failed to address it promptly.  *Ramsey v. Henderson,* 286 F.3d 264, 268 (5th Cir.2002).  For harassment to affect a term, condition or privilege of employment, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Id.*  To make this

determination, the court considers: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* The Supreme Court has warned that these high standards are intentionally demanding, and require a plaintiff to provide proof of severe or pervasive conduct that can be categorized as "extreme." *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998). Thus, merely "[o]ffensive and unprofessional behavior" alone does not violate Title VII. *Kummerle v. EMJ Corp.,* 538 Fed. Appx. 373, 374 (5th Cir. 2013).

Plaintiff's harassment claim fails because the alleged workplace conduct was not severe or pervasive. Plaintiff testified that the only person who racially harassed him was Carrington. (Pl. Dep. at 208:8-13). The first time Carrington made a racial comment to Plaintiff was the day or two prior to the shooting. (Pl. Dep. at 81:17-19). Plaintiff did not claim his interactions with Carrington impaired his ability to do his job or unreasonably interfered with his work performance. Taken as true, the foregoing is woefully inadequate to rise to the level of "severe or pervasive," as is required to make a *prima facie* case of hostile work environment. *Hockman v. Westward Comm.,* 407 F.3d 317, 328 (5th Cir. 2004). In the end, although Carrington's <u>alleged</u> ethnic comments would be offensive, they do not rise to the level of actionable ethnic harassment based on the totality of circumstances presented by this case.

Even if Plaintiff proves that his claims concerning Carrington destroyed his opportunity to succeed in the workplace, his hostile environment claim still fails because Plaintiff did not take advantage of Cameron's remedial measures. Plaintiff testified that he never reported Carrington for harassment; rather, he "threatened to" report him and said he "could" report him. (Pl. Dep. at 87:14-22, 138:4-140:7 and Pl. Exs. 8 at p.6, 13-14) (Tabor Ex. 1). Neither Burger nor Lambert were ever informed that Plaintiff claims he had been racially harassed. Plaintiff

knew that he could report Carrington and <u>threatened</u> to do so, but he never did.  Plaintiff's failure

to timely report the alleged ethnic harassment bars his claims as a matter of law.  *See Casiano, v.*

*AT&T Corp.,* 213 F.3d 278, 287 (5th Cir. 2000).

Summary judgment is also proper because Cameron took prompt remedial action as

Carrington and Perez were immediately terminated.  This was less than a week after Plaintiff had

his first altercation with Carrington.  (Pl. Dep. at 57:7-58:6, 63:19-25 and Pl. Ex. 7-8).  As

Plaintiff stated, that week "was the first time that Scott made a racial comment to [Plaintiff]."

(Pl. Dep. at 81:17-19).  Accordingly, Plaintiff had to work alongside Carrington for two days

after he first used any racial language to Plaintiff.  Cameron took prompt remedial action as a

matter of law.  *See Stewart v. Mississippi Transp. Com'n,* 586 F.3d 321, 330 (5th Cir. 2009).

## IV.    CONCLUSION

For the foregoing reasons, Cameron is entitled to judgment as a matter of law with

respect to all Plaintiff's claims.

Respectfully submitted,

*Drew B. Tipton*
Drew B. Tipton
Federal No. 18024
Texas Bar No. 00791799
811 Main Street, Suite 1100
Houston, Texas 77002
(713) 646-1348 Telephone
(713) 751-1717 Facsimile
**ATTORNEYS FOR CAMERON
INTERNATIONAL CORPORATION**

Of Counsel
Baker Hostetler, LLP

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served upon all
parties via ECF system and U.S. mail on June 2, 2015.

*Drew B. Tipton*
Drew B. Tipton