UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ANDY C. OLMEDA, | § | CIVIL ACTION |
| | § | |
| Plaintiff, | § | |
| | § | NO. 14-1904 |
| vs. | § | |
| | § | |
| CAMERON INTERNATIONAL | § | SECTION F |
| CORPORATION, PMG, INC., | § | |
| d/b/a a/k/a PERSONAL MANAGEMENT | § | |
| GROUP d/b/a a/k/a PMG, BILLY PEREZ | § | JUDGE: MARTIN L.C. FELDMAN |
| and SCOTT CARRINGTON | § | |
| | § | |
| Defendants. | § | MAGISTRATE: MICHAEL NORTH |

**DEFENDANT CAMERON INTERNATIONAL CORPORATION'S
STATEMENT OF UNCONTESTED MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Cameron International Corp. ("Cameron") submits the following Statement of Uncontested Material facts in support of its Motion for Summary Judgment.

1. Plaintiff, a temporary contract employee of Defendant PMG, started working at the Cameron facility in Berwick, Louisiana as a machinist in May 2013.[1]

2. PMG is a staffing agency that supplies its employees to Cameron on an as needed basis.[2]

3. Plaintiff was assigned to the night shift ("Second Shift"), and his regularly scheduled hours were from 4:00 p.m. to 4:00 a.m.[3]

4. The Cameron employee in charge of Second Shift was Angelo Cardinale, who reported, in turn, to Melvin Burger.[4] Burger was the Senior Production Supervisor.[5]

5. Billy Perez did not have the power to hire, fire, discipline, give raises, promotions, or do evaluations.[6]

---

[1] (Pl. Dep. at 42:10-13, 43:25-44:6, 47:10-12).
[2] (Pl. Dep. at 41:16-23).
[3] (Pl. Dep. at 48:17-49:4).
[4] (Pl. Dep. at 49:16-21).
[5] (Burger dep. at 8:1-4).

6. Over the course of a few days after the shooting incident, Plaintiff prepared a type-written statement which he gave to law enforcement detailing "what had transpired, including anything and everything leading up to the incident, what may have motivated the incident and anything else he felt was important."[7]

7. Plaintiff's problems with Carrington first started on September 9, 2013 (five days before the shooting incident) at a safety meeting during which he complained that the younger guys on Second Shift were leaving a mess for Cardinale to clean up.[8]

8. Plaintiff's comments at that safety meeting were "the cause of the present situation spiraling out of control."[9]

9. At that meeting, Plaintiff stated:

"I am frankly upset that every night when at the end of the shift I see Angelo out there picking up you all's shit, and you all should be ashamed of your asses for letting Angelo pick up after you." Then there was silence in the room.[10]

10. Tuesday, September 10, 2013, "was when the harassment started."[11]

11. A PMG employee named Thomas Bragg and some other employees started calling Plaintiff "Snorkel."[12] The term Snorkel meant that his co-workers thought that, because of the comments Plaintiff had made at the previous safety meeting, Plaintiff had his head so far up Cardinale's ass that he needed a snorkel to breathe.[13]

12. The only reason he was being teased in this fashion was because he was perceived as a suck-up or brown-noser.[14]

13. Bragg apologized to Plaintiff, and at that point it was behind him.[15]

14. On Thursday, September 12, 2013, while standing in line for the Boot Sales truck, Carrington became annoyed by Plaintiff and called him an "f-ing liar."[16] Plaintiff was offended by the comment and turned "really red."[17]

---

[6] (Perez dep. at 12:24-13:1, 63:13-64:4, 64:25-65:2) (Carrington dep. at 18:25-19:12).
[7] (Affidavit of Det. Blake Tabor at ¶ 3 and Tabor Ex. 1).
[8] (Pl. Dep. at 57:14-58:6, 64:7-65:21 and Pl.Ex. 8 at p.4) (Tabor Ex. 1).
[9] (Pl. Dep. at 63:19-25 and Pl. Ex. 8 at p. 4).
[10] (Pl. Dep. at 67:11-16 and Pl. Ex. 8 at p.4) (Tabor Ex. 1).
[11] (Pl. Dep. at 68:18-21 and Pl. Ex. 8 at p.5) (Tabor Ex. 1).
[12] (Pl. Dep. at 69:6-14 and Pl. Ex. 8 at p.5) (Tabor Ex. 1).
[13] (Pl. Dep. at 69:15-18 and Pl. Ex. 8 at p.5) (Tabor Ex. 1).
[14] (Pl. Dep. at 70:8-15).
[15] (Pl. Dep. at 112:8-18).
[16] (Carrington dep. at 9:25-10:6).

2

15. Later that night, Carrington walked past Plaintiff's work station to get a tool when Plaintiff told Carrington "I hope you value your life, everything you have in it, your job, because you're not going to have it soon. It's all going to be gone soon."[18]

16. Carrington was upset in particular by the comment about valuing his life because he was a war veteran and this comment hit home to him.[19]

17. Plaintiff told Carrington:

    "Look Scott, you must be stupid or something. Don't you realize that this is the work place and I could bring harassment charges up against you, which you probably would lose your job, then I would sue you in civil court and then I'd be the one laughing because you're a moron."[20]

18. Plaintiff and Carrington engaged in a profanity laced argument, which culminated in what Plaintiff alleges was the first threat by Carrington to Plaintiff.[21]

19. Plaintiff left work early that night, so there were no other confrontations or issues that evening.[22]

20. Around 8:00 p.m., Carrington and Perez took a half day of vacation and left early.[23]

21. Perez and Carrington first went to Twin Peaks where they drank heavily, and then to "Rickochet Billiards" (a pool hall) in Houma, Louisiana where they got very drunk over the course of the next several hours.[24]

22. The first time Perez and Carrington discussed doing anything with respect to Plaintiff was after they were intoxicated the night of the shooting.[25]

23. In their drunken state, they decided that it would be a good idea to find Plaintiff that evening and fire a shotgun in the vicinity of his truck in order to frighten him.[26]

---

[17] (Carrington dep. at 9:25-10:6, 19:13-20:4).

[18] (Carrington dep. at 10:7-12, 20:6-15) (Burger Ex. 2).

[19] (Carrington dep. at 20:13-15, 26:7-20).

[20] (Pl. Dep. at 87:14-22 and Pl. Ex. 8 at p.6) (Tabor Ex. 1).

[21] (Pl. Dep. at 88:6-89:2 and Pl. Ex. 8 at p.6) (Burger Ex. 2).

[22] (Pl. Dep. at 89:19-25 and Pl. Ex. 8 at p.6) (Tabor Ex. 1).

[23] (Pl. Dep. at 95:12-96:1 and Pl. Ex. 8 at p.6) (Perez dep. at 33:22-25).

[24] (Perez dep. at 67:16-24) (Carrington dep. at 29:7-30:18, 31:6-17).

[25] (Perez dep. at 36:6-11, 65:9-21) (Carrington dep. at 32:14-16, 75:20-23).

[26] (Perez dep. at 22:1-5, 50:4-10) (Carrindoton dep. at 17:15-18:4, 79:20-80:3).

3

24. Plaintiff finished his shift and left at 4:00 a.m. early Saturday morning, which was his normal departure time.[27] Plaintiff planned to travel to his house in Mandeville for the weekend.[28] Plaintiff initially went to his hotel, took a shower, and packed.[29] Plaintiff next met a friend at the Wal-Mart in Morgan City at 5:00 a.m. to pick up a cat to take with him.[30] Finally, Plaintiff filled his truck with gas and started driving down Highway 90 toward Mandeville.[31]

25. Perez and Carrington waited for Plaintiff at the hotel while he showered, and then followed him to the Morgan City Wal-Mart.[32]

26. After driving approximately 30 miles, Perez and Carrington pulled up behind Plaintiff on Highway 90, and Carrington shot and struck Plaintiff's truck from a vehicle that was driven by Perez.[33]

27. When Burger received Plaintiff's message at work on Saturday morning, he immediately notified his supervisor, Duane Carriere, the Human Resources Manager at Cameron's Berwick facility, Kelly Lambert, and Erich Heitman, the PMG liaison.[34]

28. Cameron immediately suspended Carrington and Perez pending an investigation and to give law enforcement the opportunity to complete its criminal investigation.[35]

29. PMG decided to remove Plaintiff from the Cameron facility following the incident.[36]

30. Burger talked with the members of the Second Shift as they reported to work on Saturday, September 14, 2013 – the day of the incident.[37] Burger heard a wide variety of stories and theories about what might have transpired from the employees.[38]

31. Thomas Bragg prepared a written statement, which states as folllows:

---

[27] (Pl. Dep. at 98:23-99:2 and Pl. Ex. 8 at p.6) (Tabor Ex. 1).

[28] (Pl. Dep. at 60:9-13).

[29] (Pl. Dep. at 100:1-6 and Pl. Ex. 8 at p.6) (Tabor Ex. 1).

[30] (Pl. Dep. at 58:7-17, 100:7-15 and Pl. Ex. 8 at p.6) (Tabor Ex. 1).

[31] (Pl. Dep. at 100:10-15 and Pl. Ex. 8 at p.6) (Tabor Ex. 1).

[32] (Perez dep. at 66:11-22).

[33] (Pl. Dep. at 101:16-102:21 and Pl. Ex. 8 at pp.6-7) (Tabor Ex. 1) (Perez dep. at 46:6-47:1, 49:23-50:3, 67:1-15).

[34] (Burger dep. at 58:18-59:1, 70:2-8).

[35] (Lambert Dec. at ¶ 6) (Burger dep. at 42:25-43:15).

[36] (Pl. Dep. at 108:12-19 and Pl. Ex. 11) (Burger dep. at 106:21-107:21, 123:20-124:15).

[37] (Burger dep. at 42:25-43:15, 71:16-72:13 and Burger Ex. 11 at p.3).

[38] (Burger dep. at 42:25-43:15, 71:16-72:13 and Burger Ex. 11 at p.2).

4

> On 9-12-13, I was approached by Andy Olmeda and told about a confrontation between himself and Scott Carrington. Andy told me that Scott had approached Andy's area to get some holding clamps from a cabinet. According to Andy, Scott had called him a dumb shit. Andy then told Scott that he should shut the f--- up or that he (Andy) would own Scott's truck, his house, everything, and that Scott would be working for Andy for the rest of his life. And that Scott would not have a job anymore. I do not know what Scott's response was to Andy, other than when Scott came to my machine and told me what had happened. All Scott said about it was that Andy could get a brick thru his windshield. At no time did Scott threaten to kill or harm Andy.[39]

32. On Monday, September 16, 2013, (the next workday after the shooting incident) Cameron was informed by the police that Perez and Carrington admitted to firing a weapon in the vicinity of Plaintiff's vehicle.[40] As a result, Cameron immediately terminated them both.[41]

33. Perez and Carrington both pled guilty to aggravated criminal damage to property and Carrington pled guilty to illegal discharge of a firearm.[42]

34. PMG had already set up a replacement for Plaintiff, and Plaintiff never returned to work at the Cameron Berwick facility.[43]

35. The primary detective for the criminal investigation was Detective Blake Tabor.[44] Detective Tabor asked Plaintiff to take a few days to prepare a detailed statement of what had transpired, including anything and everything leading up to the incident, what may have motivated the incident and anything else he felt was important.[45] Plaintiff prepared a typed statement, which is attached as Exhibit 1 to Detective Tabor's Affidavit.[46]

36. During the course of Detective Tabor's interview with Plaintiff and subsequent investigation, Plaintiff never mentioned anything about race or ethnicity being part of any issues involving Scott Carrington and Billy Perez, Jr.[47]

---

[39] (Burger Ex. 2).

[40] (Lambert Dec. at ¶ 9) (Burger dep. at 43:16-20, 139:15-22).

[41] (Lambert Dec. at ¶ 9) (Burger dep. at 43:16-20, 139:15-22) (Perez dep. at 68:23-25) (Carrington dep. at 52:4-5).

[42] (Perez dep. at 11:20-12:1) (Carrington dep. at 47:8-19).

[43] (Lambert Dec. at ¶ 8) (Burger dep. at 106:18-107:20).

[44] (Affidavit of Det. Blake Tabor).

[45] (Affidavit of Det. Blake Tabor).

[46] (Tabor Ex. 1).

[47] (Affidavit of Det. Blake Tabor).

37. At no time subsequent to Detective Tabor's initial interview of Plaintiff, his request for Plaintiff to type up a detailed statement of the events, or his further investigation, did Plaintiff ever call to amend or modify his report or to make a claim that he felt there was race or ethnicity involved in the incident or leading up to the incident.[48]

38. At no time was Detective Tabor ever told about or did he discover any evidence of a document called "10 Ways to Kill Andy Olmeda."[49]

39. Carrington and Perez were heavily intoxicated at the time of the incident.[50]

40. The shooting incident occurred over nine hours after Carrington and Perez left work that afternoon, and almost two hours after Plaintiff had left work for the weekend.[51]

41. Additionally, the incident occurred over 30 miles away from Cameron's Berwick facility after Plaintiff had made several stops in preparation for, and had begun, his trip to Mandeville.[52]

42. Olmeda was covered by workers compensation insurance during the entire period in questions.[53]

43. Cameron generally had control over Plaintiff while he was at the Berwick facility.[54]

44. PMG provided Cameron with temporary labor as requested by Cameron, and Cameron, in return, paid PMG in accordance with the terms of the Master Staffing Services Agreement.[55]

45. Cameron supplied the machine from which Plaintiff worked at Cameron's facility.[56]

46. Plaintiff was employed at the Cameron Berwick facility for six months.[57]

47. Cameron retained the right to have PMG employees removed.[58]

---

[48] (Affidavit of Det. Blake Tabor).

[49] (Affidavit of Det. Blake Tabor).

[50] (Carrington Dep. at 71:14-72:15, *see also* 17:25-18:4, 33:14-34:15, 38:16-18) (Perez Dep. at 81:21-82:5, 82:19-21, *see also* 14:11-19, 18:24-19:22, 39:12-15, 67:25-68:6, 68:10-68:22).

[51] (Pl. Dep. at 60:10-61:22, 103:14-21 and Pl. Ex. 8 at p.7).

[52] (Pl. Dep. at 61:14-22 and Pl. Ex. 9).

[53] (Williams Dec. at ¶ 3 and Williams Ex. 2).

[54] (Burger Dep. at 11:24-12:10).

[55] (Lambert Dec. at ¶ 13) (Williams Dec. at ¶ 3 and Williams Ex. 1).

[56] (Burger Dep. at 12:11-23).

[57] (Lambert Dec. at ¶ 13).

48. PMG had the obligation to pay Plaintiff.[59]

49. Plaintiff worked under the direction of and alongside Cameron employees.[60]

50. Carrington did not have a history of violence and had not been in a fight at work.[61]

51. No one physically harassed Plaintiff in the Cameron facility.[62]

52. Plaintiff was "shocked" that the shooting occurred.[63]

53. The only person who allegedly used racial language against Plaintiff at Cameron was Carrington.[64]

54. The first time that Carrington allegedly made a racial comment to Plaintiff was in the days just prior to the shooting.[65]

55. Plaintiff never reported Carrington for harassment; rather, he "threatened to" as he told his doctors on multiple occasions.[66]

56. Lambert and Burger never heard Plaintiff allege that anyone had used racial language.[67]

57. Plaintiff does not know who at Cameron allegedly asked for Plaintiff to be terminated.[68]

58. No one who could have made a decision to remove Plaintiff from Cameron (Melvin Burger or Kelly Lambert) believed or knew that Plaintiff was Hispanic.[69]

---

[58] (Lambert Dec. at ¶ 13) (Burger Dep. at 119:8-18).
[59] (Lambert Dec. at ¶ 13).
[60] (Lambert Dec. at ¶ 13) (Burger Dep. at 11:22-12:10).
[61] (Pl. Dep. at 150:16-25).
[62] (Pl. Dep. at 157:10-158:1).
[63] (Pl. Dep. at 102:22-24).
[64] (Pl. Dep. at 208:8-13).
[65] (Pl. Dep. at 81:17-19).
[66] (Pl. Dep. at 138:4-140:7 and Pl. Ex. 13-14).
[67] (Burger Dep. at 125:4-17) (Lambert Dec. at ¶¶ 15, 17).
[68] (Pl. Dep. at 158:22-159:3).
[69] (Lambert Dec. at ¶ 17) (Burger Dep. at 138:23-139:1).

Respectfully submitted,

*Drew B. Tipton*
Drew B. Tipton
Federal No. 18024
Texas Bar No. 00791799
811 Main Street, Suite 1100
Houston, Texas 77002
(713) 646-1348 Telephone
(713) 751-1717 Facsimile

**ATTORNEYS FOR CAMERON INTERNATIONAL CORPORATION**

Of Counsel

Baker Hostetler, LLP

## **CERTIFICATE OF SERVICE**

      I hereby certify that a copy of the above and foregoing pleading has been served upon all parties via ECF system and via U.S. mail, as listed below, this 2nd day of June, 2015.

**Via E-Mail: gcmcg@mac.com**
Glenn Charles McGovern, Esq.
GLENN C. MCGOVERN, ATTORNEY AT LAW
P. O. Box 516
Metairie, LA 70004
**Counsel for Plaintiff**

**Via E-Mail: shardy@mcsalaw.com**
Sidney Jay Hardy
McCranie, Sistrunk
909 Poydras Street, Suite 1000
New Orleans, LA 70112
**Counsel for PMG, Inc.**

**Via E-Mail: bhauswirth@wfjlawfirm.com**
Bradley D. Hauswirth
Wagner, Falconer & Judd, Ltd.
1700 IDS Center
80 S. 8th Street
Minneapolis, MN 55402
**Counsel for PMG, Inc.**

Billy Perez
185 Elaine Street
Morgan City, LA 70380
*Pro Se*

Matthew Arthur Sherman, Esq. (mas@chehardy.com)
Preston Lee Hayes, Esq. (plh@chehardy.com)
CHEHARDY, SHERMAN, ELLIS, MURRAY,
RECILE, GRIFFITH, STAKELUM & HAYES
One Galleria Blvd., Ste. 1100
Metairie, LA 70001
**Counsel for Scott Carrington**

                                             *Drew B. Tipton*
                                             Drew B. Tipton