UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ANDY C. OLMEDA, | § § | CIVIL ACTION NO. 14-1904 |
| Plaintiff, | § | |
| vs. | § § | |
| CAMERON INTERNATIONAL CORPORATION, PMG, INC., d/b/a a/k/a PERSONAL MANAGEMENT GROUP d/b/a a/k/a PMG, BILLY PEREZ and SCOTT CARRINGTON | § § § § § § § | JUDGE: MARTIN L.C. FELDMAN<br><br>MAGISTRATE: MICHAEL NORTH |
| Defendants. | § | DIVISION "F-5" |

## PLAINTIFF'S OPPOSITION TO DEFENDANT CAMERON INTERNATIONAL CORPORATION'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff, Andy Olmeda ("Olmeda") filed the petition in the above-entitle matter based upon the actions of Defendants and their employees. Defendant Cameron International Corporation, filed the present Motion for Summary Judgment, to which Olmeda responds herein.

### FACTUAL BACKGOURND

Olmeda was employed as a skilled machinist at Defendant Cameron who was placed there by Defendant PMG to do sophisticated machine work on oil rig blow-out valves. Olmeda received his paycheck from PMG. (Ex. P-26, pg.33 L16-19, P-10). Cameron is clearly an employer of Olmeda. (P-26, pg. 33 L20-24) Olmeda is Spanish but he was perceived as Mexican and subjected to a plethora of racial slurs on a daily basis. (Exh. P-20; P-21; P-25) Olmeda complained to both PMG and Cameron, neither of which did anything to protect him.

1

(Exh. P-20; P-21; P-25). Things grew progressively and predictably worse. (P-1, P-3 statements of Olmeda, Carrington, Perez re: harassment at work and leading to the shooting with a shotgun, P-6 bullet holes, P-8, P-9 criminal records of guilty pleas of Carrington and Perez). Scott Carrington, who was known to be mentally unstable and violent, did not get veterans benefits as he committed a theft in the service in Iraq, and got a general discharge not an honorable discharge from the Army, and he circulated a written list of the "Ten Ways I will Kill Andy" at work. (Ex. P-16, pg. 21-22; P-21; P-25, didn't get an honorable discharge, theft charge, DUI in military). Cameron never checked Carrington's military records and his lack of honorable discharge and theft offense. (Exh. P-26 L2-17) Billy Perez was accused of threatening a supervisor Reed and cutting a chain on his motorcycle. (Exh. P-26, pg.29, L15-25, L7-14). Perez was fired for being absent, not sabotage/threats and rehired later with a know propensity for threats and violent acts. Olmeda again complained to both Cameron and PMG. (P-21, P-20) Nothing was done but PMG fired him. (P-18, PMG emails PMG_0001-0005; P-27, pg. 24 L25, pg. 25 L1-23, pg. 26 L1-75). *There was no investigation by PMG nor Cameron International. No one came down to check on Olmeda of the other PMG employees in the Cameron hostile workplace. (Ex. P-2 P. 39, 40, 41, 47). Cameron also did not do an proper investigation, never interviewed Carrington, Perez, and never talked to Olmeda nor any supervisors nor any PMG or Cameron employees as to how this happened or why this happened even after the shooting occurred-- the Sheriff told Cameron Carrington and Perez confessed to the shooting of Andy Olmeda and neither PMG nor Cameron did any investigation of violent acts arising out of a Cameron workplace dispute. (P-26, pg. 7 L19-25 pg. 8 L1-18). There was no discipline against Perez, a supervisor who egged Carrington and others on, nor against Carrington except they Perez and Carrington were fired for not showing up at work due to being in jail (Ex. P-23 & P-24) Carrington and Perez followed Olmeda from work and fired a shotgun at his vehicle,*

*riddling it with buck shot.   (P-3, P-21, P-18, P-25, P-10, P-18 PMG emails PMG_0001-0005).* Carrington and Perez plead guilty to criminal damage to property and illegal discharge of firearms at Olmeda and incurred jail time.  (Ex. P-3, P-9 court minutes).  *No one from Cameron came down to investigate the acts of violence at Cameron Berwick.* **(Exh. P-26 L57, L14-18)**

PMG claims Cameron asked PMG to send a replacement for Olmeda which it did after Olmeda complained he was almost killed due to PMG and Cameron's total inaction.  (Ex.  P-18, PMG _0001-0005, PMG emails, P-28, P-27, P-25, P-21; Exh. P-26 pg. 57 L14-18). Cameron has no documents to show it requested Olmeda stay on nor offered him a job at anytime to date. Both PMG and Cameron had control over Olmeda, had him bound by both companies rules and both financially gained by Olmeda's employment.  PMG seeks dismissal even though it issued Olmeda's paycheck and is clearly an employer. (Ex. P-10 Olmeda was paid by electronic deposits from PMG's agents).  Cameron paid PMG who then paid Olmeda. Both had control over his work and both set rules and had control over Olmeda. Cameron's workplace was a hostile environment for anyone perceived different much less perceived as a Mexican. Olmeda was called Beaner, a derogatory word for Mexican. (Exh. P-21, P-20, P-25 even Thomas Bragg admitted calling Olmeda a Beaner.) The facts of the case are specifically pleaded as set out below. Whether there is or is not a common enterprise is not the issue.  PMG and Cameron both controlled and employed Olmeda at a hostile workplace at Cameron at Berwick, La.   Both Cameron and PMG totally failed to investigate his numerous complaints over weeks and weeks and failed to take action, then retaliated against Olmeda after he was shot. Olmeda got shot at and PMG even stated it showed he had a lack of character and removed him and never rehired him again to date. (P-18 PMG_00005)  Cameron claims Olmeda did great work and PMG fired him but there are no documents or emails to show this is true. (Exh. P-26 pg. 20 L24-15, pg. 21 L1-25). Cameron did testify that PMG removed him immediately and never returned him to any

3

job on earth much less at Cameron. The pretext argument is PMG removed Olmeda for his safety but they never put him back to work at Cameron nor any place through PMG.

Both Cameron and PMG kicked Olmeda to the curb after he had the audacity of complaining about being shot with buckshot, blowing out a tire on the highway, and complaining about the Beaner slurs, Snorkel harassment, daily slurs, daily profanity and humiliation even by Thomas Bragg and Angelo Cardinale who let his workers get out of control on many occasions. Cardinale was a supervisor at night when Olmeda worked and he knew of the threats to Olmeda. (Exh. P-21, P-25)

## LAW AND ARGUMENT

I.  Summary Judgment

The Fourth Circuit recently made an important statement regarding our system of jury trials when it noted that "[w]e have never held that a grant of summary judgment in favor of a defendant is a legitimate substitute for a jury verdict in favor of the defendant . . ." Hoyle v. Freightliner, LLC, 650 F.3d 321, 334-35 (4th Cir. 2011). Summary judgment is only proper if this Court determines that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Reese v. Anderson, 926 F.2d 494, 498 (5th Cir. 1991). This Court must go beyond the pleadings and review the entire record to determine presented to the District Court to determine if the moving party is entitled to judgment as a matter of law. Copeland v. Wasserstein, Perella, and Co., 278 F.3d 472, 477 (5th Cir. 2002).

Summary judgment is only proper if the trial court determines that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Reese v. Anderson, 926 F.2d 494, 498 (5th Cir. 1991). The trial court must go beyond the pleadings and review the entire record to determine if the moving party is entitled to judgment

4

as a matter of law. Copeland v. Wasserstein, Perella, and Co., 278 F.3d 472, 477 (5th Cir. 2002). Summary judgment is warranted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(C). Summary judgment is not proper if the party opposing summary judgment properly raises a question of fact. John v. State Louisiana Bd. Of Trustees for State Colleges and Universities, 757 F.2d 698, 703 (5th Cir. 1985). A "genuine issue" of "material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The court must look to the applicable substantive law and then view the facts presented in a light most favorable to the non-moving party. Huckabay v. Moore, 142 F.3d 233, 238 (5th Cir. 1998). A court may not weigh the evidence or make credibility determinations when reviewing the record presented to it. Perenco Nigeria, Ltd. v. Ashland, Inc., 242 F.3d 299, 304 (5th Cir. 2001). All justifiable inferences are made in favor of the non-moving party without weighing the evidence or evaluating the credibility of witnesses. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 390 (5th Cir. 1998). After the parties have presented their facts, any factual controversy is resolved in favor of the non-moving party. Olabisiomotosho v. City of Houston, 185 F.3d 521, 525 (5th Cir. 1999).

II. Defendant Cameron is Vicariously Liable for the Actions of its Supervisory Employees

An employer is subject to vicarious liability for an actionable hostile work environment created by a supervisor with authority over the employee. Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998). An employer is liable for the torts of an employee committed while the employee is acting within the course and scope of his employment. LA. CIV. CODE art. 2320;

Baumeister v. Plunkett, 673 So.2d 994, 996 (La. 1996). The employee must be acting at least partially in furtherance of his employer's objectives when the tort is committed. LeBrane v. Lewis, 292 So.2d 216, 219 (La. 1974). A court must look to four factors to determine whether or not an employer will be liable. Baumeister, 673 So.2d at 996-97. These include (1) whether the tortious act was primarily employment rooted; (2) whether the tortious conduct was reasonably incidental to the performance of the employee's duties; (3) whether the tortious conduct occurred on the employer's premises; and (4) whether the conduct occurred during the hours of employment. Id. at 996-97 citing LeBrane, 292 So.2d at 218-19.

A "supervisor" is a person that a company holds out as having authority over the employee and the employee perceives that the individual has authority to make employment related decisions regarding the employee. Gay v. Bd. of Trustees of San Jacinto Col., 608 F.2d 127, 128 (5th Cir. 1979). Clearly Olmeda would have reason to believe that the individuals who direct his work serve in a supervisory capacity.

Clearly Carrington and Angelo Cardinale was a supervisor to Olmeda. (Ex. P-21). He directed his work. (Ex. P-21). He told him where to work and what to do. He was in charge of his work. Cameron held Carrington, Perez and Angelo Cardinale out as Olmeda's superior. (P-21, P-11, P-12) Olmeda believed Carrington and Cardinale to be his superiors with authority to make decisions which affect the terms and conditions of his work. (Ex. P-21)

III.  Plaintiff is Entitled to Bring Evidence Before the Jury on His Negligence Claims

A. Worker's Compensation Does not Bar Plaintiff's Claims

The intentional tortious acts of supervisory employees are not precluded by the Louisiana Worker's Compensation Act. LA. CIV. CODE art. 23:1032 (B) states that nothing in the Act "shall affect the liability of the employer, or any officer, director, stockholder, partner, or employee of such employer or principal to a fine or penalty under any other statute or the

liability, civil or criminal, resulting from an intentional act. Clearly the actions of Cameron's employees are both intentional and violate State and Federal law.

    B. Cameron Owed a Duty to Plaintiff

Cameron, as an employer who directed Olmeda's work and hired and fired his supervisors, owed a duty to Olmeda to ensure that he was protected from harm from them. Cameron and Cardinale was aware, based on Olmeda's complaints, that he was subject to harassment and threats. Cameron and Cardinale as its supervisor and agent therefore had a duty to remove the offending employees from their positions or to protect Olmeda from the harm that could, and ultimately did, ensue. Cameron had no policy to protect Olmeda. As David Williams designated corporate representative for Cameron stated in the FRCP 30(b)(6) deposition of Cameron: **"Okay. Do you know if Mr. Andy Olmeda got a copy of that policy? A: to the best of my knowledge I am not sure."** Corp. Depo. Cameron Exh. P-26 pg. 59 L10-16) If there was a policy in place, there is no evidence Andy Olmeda was ever told about it, how it worked and what to do about it. Also when he tried to call Melvin Burger on his cell, Angelo Cardinale pulled his arm and stopped Olmeda from filing a complaint of racial harassment and death threats with a higher supervisor Melvin Burger. (Exh. P-21 and Depo. Olmeda Exh. P-22 pg. 97 L3-9) Cardinale then had Thomas Bragg call Olmeda at this hotel to convince Olmeda not to file a formal complaint with Melvin Burger. (P-22 Depo. Olmeda pg. 90, 91, 92)

    C. Intoxication does not Preclude Liability

This argument is quite puzzling. Cameron's employees were quite obviously drinking after they were let off early and Scott Cameron had a verbal altercation with Andy Olmeda that Angelo Cardinale knew about happened on the job. Olmeda was upset and did not want to let Olmeda go home early and even asked Olmeda how he would explain this to Melvin Burger. (Ex. P-21, P-22, pg. 96-97, & P-38). Then the next thing Olmeda is driving to his hotel and sees

7

a muzzle blast in his rearview mirror. (P-22, pg. 102-103). If Cardinale and Cameron did not approve of such conduct, it would have made sure it took steps to prevent it. It appears Cardinale thought it was a joke and fun and games letting employees harassing Olmeda daily and shouting Snorkel for all day in the plant for example. How humiliating was that to Olmeda?—and he did not quit the job. There is no evidence that intoxication was the cause of the injury. The cause of the injuries were shotgun blasts made by supervisory employees Carrington and Perez let off early the Cardinale, and leaving early with Cardinale's consent even though Cardinale knew about the threats against Olmeda by Carrington earlier, so it should be no surprise as they followed Olmeda home from work about a workplace dispute earlier in the day. Olmeda told Cardinale he was scared something would happen and crazy Carrington would make good on one of his l0 ways to kill Andy. (Exh. P-20, P-21, P-25, P-22 pg. 105)

D. Cameron Breached its Duty to Olmeda Resulting in Olmeda's Injury

LA. CIV. CODE art. 2315 protects our citizens from the intentional and negligent actions of tortfeasors. Petitioner plead state claims including assault, battery, negligent infliction of emotional distress and intentional infliction of emotional distress. (Paragraphs 7, 9, 13, 32, 37 of original petition of plaintiff) Clearly Cameron, through its employees and supervisor Angelo Cardinale, was negligent in failing to ensure the safety of its employee, Olmeda who it profited from his labor and controlled him in the workplace of Cameron. Cardinale and Cameron was well aware that of Carrington's and Perez's treatment of Olmeda. Cardinale knew, or should have known, that something bad would occur when he allowed Carrington and Perez to leave early to pursue Olmeda. (Exh. P-21) This breach of a duty to protect Olmeda resulted in Olmeda's attack and nearly resulted in his death. Cameron is not entitled to summary judgment on the negligence count under LA. CIV. CODE art. 2315.

IV. <u>Cameron is Not Entitled to Summary Judgment on Olmeda's Emotional Distress Claim</u>

Louisiana recognizes claims for intentional infliction of emotional distress. <u>White v. Monsanto Co.</u>, 585 So.2d 1205, 1209 (La. 1991). The elements of a claim for intentional infliction of emotional distress are (1) that the conduct was extreme and outrageous; (2) that the emotional distress the plaintiff suffered was severe; and (3) that the defendant desired to inflict emotional distress or knew that severe emotional distress would be substantially certain to follow the conduct. <u>Id.</u>; <u>Lawson v. Strauss</u>, 673 So.2d 223, 226 (La. Ct. App. 1996) <u>writ denied</u> <u>Lawson v. Strauss</u>, 678 So.2d 556 (La. 1996). Certainly be shot at with a shotgun with buckshot and deflating a tire as well causing loss of control of Olmeda's truck is a traumatic event when you fear death. (Ex. P-3, P-9).

V. <u>Olmeda has Presented Sufficient Evidence to Bring his Hostile Work Environment Claim before the Jury</u>

To establish a claim of hostile work environment, a plaintiff must prove that he (1) belongs to a protected class; (2) was subjected to unwelcome harassment; (3) the harassment was based on his race; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. <u>Ramsey v. Henderson</u>, 286 F.3d 264, 268 (5th Cir. 2002).

Discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment that violates Title VII. See <u>DeAngelis v. El Paso Mun. Police Officers Ass'n</u>, 51 F.3d 591, 593 (5th Cir.1995). To prove a hostile environment claim, a plaintiff must demonstrate that the discriminatory conduct was severe or pervasive enough to create an objectively hostile or abusive work environment. <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 20

(1993). This event was a shooting of an employee on the highway at night at close range with a shotgun. (Ex. P-3 pg. 99)

It is undisputed that Olmeda belongs to a protected class. He was also clearly subject to unwelcome harassment, which was based on his Hispanic race. Olmeda made numerous complaints to both PMG and Cameron to no avail. (Exh. P-21, P-22, P-25) He received numerous threats that he relayed to both of his employers. He was constantly bombarded by insults regarding his perceived Mexican heritage. (P-21) Nothing was ever done. There were no remedial actions taken. Not until Olmeda was shot several times by Carrington and Perez. (Ex. P-11, P-12, P-10, P-19, P-3, P-1, P-9, P-23, P-24, P-18 PMG _0001-0005)

VI. <u>Cameron is Not Entitled to Summary Judgment on Olmeda's Retaliation Claim</u>

Title VII of the Civil Rights Act of 1964 makes it "an unlawful **employment** practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of **employment**, because of such individual's race, color, religion, sex, or national origin." 42 U. S. C. § 2000e-2(a)(1). 42 U.S.C. § 2000e-3(a) makes it "an unlawful employment practice for an employer . . . to discriminate against any individual . . . because he opposed any practice made an unlawful employment practice by this subchapter." To establish a claim for retaliatory conduct, a plaintiff must demonstrate (1) that she was engaged in behavior protected by statute, (2) that she was subject to adverse employment action, and (3) that engaging in the protected activity caused the adverse action against her. <u>Evans v. City of Houston,</u> 246 F.3d 344, 352 (5th Cir. 2001).

Title VII forbids employers to take actions on the basis of race or sex that discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment. <u>Migis v. Pearle Vision, Inc.</u>, 135 F.3d 1041, 1046 (1998). An "employer" under Title VII is a "person in an industry affecting commerce who has fifteen or more employees." 42

U.S.C. §2000 (e) (b). For harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. McKinnis v. Crescent Guardian, Inc., 189 Fed.Appx. 307, 309-10 (5th Cir.2006) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)). The challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile abusive and subjectively offensive, meaning that the victim perceived it to be so. Harvill v. Westward Commc'ns, L.L.C., 433 F.3d 428, 434 (5th Cir.2005).

In Vinson, 477 US at 66, the Supreme Court explained that an employee's protections under Title VII extend beyond the economic aspects of employment:

> [T]he phrase `terms, conditions or privileges of employment' in [Title VII] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination. . . . One can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers.

Id.

Cameron asked or did not protest when PMG removed Olmeda permanently according to PMG in its corporate deposition (Ex. P-27, pg. 79 ) to terminate Olmeda following the incident and PMG and Cameron never offered him work and PMG stated the never would employ Olmeda after the shooting. This is a disputed material fact for the jury to decide Cameron and PMG's actions and motives. Cameron was advised by Olmeda that he had filed lawsuits before and he would do it again. Why would Olmeda say that unless he was called a Beaner, a Spic and profanities on a daily basis—he just had enough. But he did not shoot anyone nor hit anyone at Cameron. Even Bragg called him a Beaner-a PMG co-worker. (P-25) After the incident, Cameron perceived Olmeda to be more trouble than what it wanted to deal with and did not send any emails or has any documents it wanted Olmeda to stay. (Ex. P-26, P-18 emails PMG 0001-0005). It made business sense to Cameron that it would rather not have an employee

that would enforce his rights or complaint about harassment. They certainly didn't want an employee that other employees who used racial slurs and humiliated at work like the snorkel incident, that they trusted and put in positions of authority, felt was appropriate to shoot at and attempt to murder. Cardinale knew of the threats and did nothing even preventing Olmeda from calling Melvin Burger when Olmeda was frustrated Cardinale did nothing to stop the escalation of threats and the predictable shooting. (Ex. P-21 & P-22) A list of 10 ways to kill Andy Olmeda is laughed at and not investigated by Cardinale a supervisor at Cameron. (P-22 pg. 105) It is unforgivable and foreseeable Andy Olmeda would soon be a victim of violence by Cameron employees. This case is not just about Andy Olmeda, It is about all employer duties to protect all employees in the workplace in our community. Cameron's motion must be denied for the safety of all employees in the workplace in all communities, especially minorities when the employer knew or should have known of the harassment that could and almost turned deadly. Don't give PMG nor Cameron a free pass. There are disputed material facts that cry for this to be heard by a jury in our community. Cameron and PMG's motion should be denied.

## CONCLUSION

For the foregoing reasons, Defendant Cameron's motion respectfully must be denied in its entirety and this matter continue to trial on its merits.

Date: June 23, 2015

        Respectfully Submitted:

        *s/ Glenn C. McGovern*
        **GLENN C. MCGOVERN** (La. Bar #9321)
        Attorney for Petitioner
        Mailing Address:
        P.O. Box 516
        Metairie, Louisiana 70004-0516
        Physical Address:
        2637 Edenborn Avenue, Suite 101
        Metairie, Louisiana 70002
        Telephone: (504) 456-3610
        Facsimile: (504) 456-3611
        Email: gcmcg@mac.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of June, 2015, a copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, and that a copy of same was forwarded to all counsel of record by facsimile and U.S. First Class Mail, properly addressed, postage prepaid and said Notice of Filing same has been sent via Court's CM/ECF system to each party.

        *s/ Glenn C. McGovern*
        Glenn C. McGovern, Attorney for Plaintiff