UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

ANDY C. OLMEDA                              CIVIL ACTION

v.                                          NO. 14-1904

CAMERON INTERNATIONAL CORPORATION, ET AL.   SECTION "F"

<u>ORDER AND REASONS</u>

Before the Court are four motions: (1) Cameron International Corporation's motion for summary judgment; (2) Cameron International Corporation's objections and motion to strike plaintiff's summary judgment evidence; (3) Personnel Management Group, Inc.'s motion for summary judgment; and (4) Personnel Management Group, Inc.'s objections and motion to strike plaintiff's summary judgment evidence. For the reasons that follow, the motions to strike are GRANTED in part and DENIED in part and the motions for summary judgment are GRANTED.

**Background**

This employment discrimination lawsuit arises from an off-premises, off-duty drive-by shooting incident on Highway 90 around Morgan City, Louisiana. Hours after leaving work, one drunk employee, Scott Carrington, was being driven by another drunk employee, Billy Perez; they had decided to scare a co-worker, Andy Olmeda, by firing a shotgun in the vicinity of his moving vehicle. That they did. After driving about 30 miles, Perez and Carrington

1

pulled up behind and fired a shotgun at Olmeda's truck as they all drove northbound up the highway.

Personnel Management Group, Inc., a Bloomington, Minnesota company, recruits and deploys temporary skilled manufacturing laborers and provides labor solutions to manufacturing companies in the United States.[1]  For companies facing labor shortages, peak season, production backlog, or other labor crises, PMG provides skilled temporary replacement labor.  PMG recruits do part-time contract work and have no guarantee of employment.  PMG supplies employees to Cameron International Corporation on an as-needed basis.[2]

Andrew C. Olmeda is half-white and half-Hispanic.  Olmeda, a PMG temporary contract worker,[3] began working at Cameron as a

_____

[1] At no time did PMG employ 20 people in the state of Louisiana for 20 or more weeks.

[2] PMG and Cameron are separate companies that do not share any management, ownership, or financial control.  Cameron maintains its own operations, controls the employee's conduct, has the right to hire and fire the contract employee, supervise the employee, and set the employee's work schedule.  PMG did not maintain an office at Cameron's facility, did not supply Cameron with the majority of its workforce and did not engage in any business venture.

[3] Olmeda signed a temporary employment agreement with PMG on March 12, 2013, in which Olmeda acknowledged that assignments are temporary, there is no promise of employment, he is employed at will, and he can be terminated without cause or notice.  The PMG-Olmeda temporary employment agreement requires Olmeda to represent PMG and himself in a professional and respectful manner and abide by all policies, terms, and conditions.  Olmeda agreed to follow PMG's "gold standard" and represent PMG, himself, and PMG's client in a positive and productive manner, or he would be subject to

machinist at its facility in Berwick, Louisiana in May 2013.[4]
Olmeda was placed at Cameron by PMG recruiter Joe Coombs.  PMG
reported Olmeda's race as "white" to Cameron when providing
employee information.  Olmeda admits that he may have told PMG that
he is white.[5]

As a machinist, Olmeda made parts for offshore and onshore
drilling; he worked on blow-out preventers, valve bodies,
couplings, and generally anything that was associated with a valve.
During the workweek, PMG provided Olmeda with a hotel room in
Morgan City, five miles from Cameron's Berwick facility.  Olmeda
worked the night, or second, shift with 15-20 other workers; his
regularly scheduled hours were from 4:00 p.m. to 4:00 a.m.  Cameron
held safety meetings at the start of each shift every day.  After
those meetings, Olmeda received his tasks for the evening and went
to his machine in the shop, which is a large warehouse.  Cameron's
Angelo Cardinale was in charge of second shift.  Cardinale reported

---

immediate termination.

[4] Before working at the Cameron facility, PMG placed
Olmeda at Tolomatic, a company that did not want Olmeda to return
to due inappropriate comments Olmeda had made at the job site.

[5] That neither Cameron nor PMG perceived Olmeda as non-
white or Hispanic appears to be without dispute in the record.  It
is also notable that the investigation report regarding the
shooting incident lists Olmeda's race as "white" and his ethnicity
as "non-Hispanic."

to Melvin Burger, the senior production supervisor.[6]

Olmeda does not complain of any specific problems between him and his co-workers from May through early September 2013; at least none that he reported.[7]  But in the days leading up to the shooting on September 14, 2013, Olmeda submits that things happened to stir up hostility between him and other workers at Cameron.  After a safety meeting on September 9, 2013, Olmeda announced to his co-workers that they should be ashamed of themselves for having Cardinale clean up after them.  Construing this as obsequiousness, the next day some of Olmeda's co-workers (Scott Carrington, Trent Basas, and Thomas Bragg) yelled for hours at Olmeda, calling him "snorkel."  Olmeda believes that "snorkel" meant that he had his "head so far up [Cardinale's] ass that [he] needed a snorkel to take a breath."  Olmeda believes that Scott Carrington (then an apprentice at Cameron) came up with the nickname "snorkel."  Olmeda understood this to be typical shop talk, guys on the floor giving each other a hard time.

The next day, Wednesday, September 11, 2013, another employee complained to Cardinale at the safety meeting that people had been

---

[6] Cameron's human resources department handled hiring and firing, not Burger.

[7] During the first few months of working at Cameron, Olmeda spoke to his PMG recruiter, Joe Coombs.  "I don't think I actually mentioned anything about racial slurs about anything, but he did ask me how it was going and I told him well we will see what happens in the next couple months," Olmeda testified.

yelling "snorkel" the night before.  This being the first he had heard of it, Cardinale spoke with Olmeda, and then he informed Burger.  Burger spoke to Olmeda, who said that it was Bragg who was the instigator.  Burger instructed Bragg to stop and to apologize to Olmeda.  Bragg apologized to Olmeda, who put the incident behind him.  Burger followed up with Olmeda the next day to confirm Bragg had apologized.  Olmeda never complained to Cardinale again.[8]

That same day, some of the second shift employees lined up to purchase boots from a vender.  Olmeda and Scott Carrington exchanged profanities.  According to Carrington, Olmeda bragged about owning luxury cars and a multi-million dollar house. Annoyed, Scott Carrington called him a "f--king liar."[9]  Olmeda says that Carrington was walking with Billy Perez[10] when he (Carrington) called Olmeda "f--king dumba-- mother f--ker" or he may have "told me to get the fuck out of the way, fucking Mexican or something like that."  Olmeda told Carrington "f--k you" and gestured with his middle finger.  At the truck on September 11 "was the first time [Carrington] made a racial comment" to Olmeda.

_____

[8] The "snorkel" incident was never reported to PMG.

[9] Carrington says that, later, he walked past Olmeda's work station and Olmeda told him "I hope you value your life [because] it's all going to be gone soon."  Carrington, a war veteran was particularly upset by the "value your life" comment.

[10] Perez's title was "lead man," which meant that he was charged with relaying instructions from Cardinale to the crew; Perez did not have the power to hire, fire, discipline, approve raises or promotions, or do evaluations.

The next day, on Thursday, September 12, 2013, Carrington shouted "Hey you dumb mother f--ker."  Olmeda told Cardinale, who called Carrington into his office.   Carrington then walked up to Olmeda at his machine and said the same thing. Olmeda responded:

> Look Scott, you must be stupid or something.  Don't you realize that this is the work place and I could bring harassment charges up against you, which you probably would lose your job, then I would sue you in civil court and then I'd be the one laughing because you're a moron?

This exchange escalated:  Carrington said "Oh so that is how it's going to be," to which Olmeda responded, "No don't you see you're the one who is doing it, not me, I'm just there to [make] sure you have enough rope."  The exchange culminated (Olmeda submits) into a threat by Carrington.[11]  Olmeda reported the threat to Cardinale. Cardinale agreed to email Burger and then sent Olmeda home around midnight that night because Olmeda was angry and needed to cool off.   Bragg called Olmeda at his hotel room, telling him not to make "harassment charges."

Olmeda reported to work at 4:00 p.m. on Friday, September 13, 2013.  Carrington and Perez left work four hours into second shift, around 8:00 p.m.   Sometime later, Perez picked up Carrington in Morgan City.  Accompanied by another co-worker named Trent Basas, they first went to a restaurant and bar called Twin Peaks, where

---

[11] Olmeda says that Carrington told him "You don't know who you're fucking with . . . you keep going on with what you're doing and you're going to be a dead guy mother f--ker."  Olmeda says that Carrington also said "watch your back . . . you're going to end up a dead man."

they ate and drank beer and liquor.  Then they went to a pool hall in Houma, where they continued to drink alcohol over the next few hours.  They got very intoxicated.  On the way back to Morgan City, they dropped off Trent.   It was during this time of "heav[y] intoxict[ion]" that Perez and Carrington decided that they would find Olmeda and fire a shotgun near his truck to frighten him. They went to Carrington's house, where Carrington got his shotgun and, at some point, Carrington loaded it.  Although "hazy" from drinking, the plan was to find and follow Olmeda and "then do something to just scare him."  When Perez blinked the high beams on his truck, that was the signal for Carrington to shoot, not at Olmeda's vehicle, but toward the woods, as he drove by.

Olmeda left his shift at the normal time, around 4:00 a.m. on Saturday morning, September 14.   He went to his hotel room, preparing to leave town to go to his house in Mandeville for the weekend.  Olmeda then met a friend at Wal-Mart in Morgan City at 5:00 a.m. to pick up a kitten to take with him.  He then filled up his truck with gas and started down Highway 90 toward Mandeville. At some point, Perez and Carrington saw Olmeda on the road and waited for him and followed him.  After driving about 30 miles on Highway 90, Perez pulled behind Olmeda and Carrington shot in the vicinity of Olmeda's truck, according to Carrington only hitting Olmeda's truck by accident.  Olmeda submits that his tire exploded and that rounds struck his truck.

Olmeda pulled into a parking lot, where he called Cardinale, who told him to call the police; he also called his girlfriend and the police.  Olmeda also left a voicemail for Burger; when Burger heard the voicemail, he called his supervisor (Duane Carriere), PMG's human resources manager (Kelly Lambert), and the PMG liaison, Erich Heitman.  Olmeda called PMG's Joe Coombs.  Coombs told Olmeda to go back to the Berwick facility to get his tools.  Olmeda refused, saying "I'm the victim . . . I'm going to stay home[;] I just got fired upon."   Coombs sent an email to others at PMG regarding the incident, advising that he had "explained [to Andy] given this highly dramatic and chaotic nature of this incident, be prepared for this assignment ending, if for no other reason than his safety may not be assured while away from work."  PMG submitted a replacement for Olmeda's position.  Cameron suspended Carrington and Perez pending an investigation; Cameron considered the incident to be a criminal matter to be handled by the police department.

When Cameron learned of the shooting, Burger talked with workers in the second shift as they reported to work on the day of the incident.  Bragg prepared a written statement about the argument that occurred between Olmeda and Carrington the day before the shooting; Bragg states:

> On 9-12-13, I was approached by Andy Olmeda and told about a confrontation between himself and Scott Carrington.  Andy told me that Scott had approached Andy's area to get some holding clamps from a cabinet. According to Andy, Scott had called him a dumb shit. Andy then told Scott that he should shut the f--- up or

that he (Andy) would own Scott's truck, his house, everything, and that Scott would be working for Andy for the rest of his life.  And that Scott would not have a job anymore.  I do not know what Scott's response was to Andy, other than when Scott came to my machine and told me what happened.  All Scott said about it was that Andy could get a brick thru his windshield.  At no time did Scott threaten to kill or harm Andy.

Detective Blake Tabor of the Terrebonne Parish Police Department investigated.  Detective Tabor asked Olmeda to submit a detailed narrative of the events leading up to and including the shooting, which Olmeda did a few days later.[12]  Nowhere in the statement does Olmeda mention anything about race or any racial comments made to him.  During the course of the interview and investigation, Olmeda never mentioned that race or ethnicity played any role in his interactions with Carrington and Perez.[13]  The investigation report lists Olmeda as "white" and his ethnicity as "non-Hispanic."

---

[12] Olmeda's girlfriend typed up his statement.

[13] Detective Tabor stated under oath:

Had Mr. Olmeda made any reference or indication whatsoever that race or ethnicity was involved or may have played a role, I would have noted that and reported it because we are required by the Federal Bureau of Investigation to track any racial bias or ethnic bias incidents.  Additionally there is an enhancement for crimes that involve race or bias. . . .  Had I had any indication that race or ethnic bias was involved, I would have charged Mr. Carrington and Perez with a more serious crime.

On Monday, September 16, 2013 the next workday after the shooting, Cameron was notified by law enforcement that Perez and Carrington admitted firing a weapon in the vicinity of Olmeda's vehicle.  Cameron immediately terminated Perez and Carrington.[14] Olmeda never returned to the Cameron facility; PMG had pulled Olmeda and set up a replacement.[15]  Cameron did not request or suggest that Olmeda not be allowed to return to work; PMG made that decision.  On September 17, 2013, Burger emailed PMG and confirmed that Cameron's human resources department approved replacing Olmeda.  More than five months later on February 25, 2014 Olmeda filed an EEOC charge, asserting that he was harassed due to national origin.  A right to sue letter was issued on June 11, 2014.

Prior to the shooting on September 14, Olmeda never told PMG or Cameron that he was getting harassed due to his ethnicity or race.  Olmeda never filed a complaint with PMG or Cameron complaining about racial slurs, phrases, or discrimination based on race or ethnicity.  Nor did he report to PMG that he feared for his

_____

[14] Eventually, Carrington pleaded guilty to aggravated criminal damage to property and illegal discharge of a firearm. Perez pleaded guilty to aggravated criminal damage to property.

[15] PMG submits that Olmeda's non-deployment was grounded in the following: that he was a temporary worker with no guaranty of work, a concern for his safety at Cameron, Cameron never requested that he be sent back, Olmeda never requested that he be sent back, and Olmeda did not dispute that the had participated in verbal altercations at the Cameron site while he was at work (the second such report to PMg by an employer of Olmeda).

life or safety, or that someone had threatened him physically.  The first time PMG was aware that Olmeda was asserting that he was harassed due to race or ethnicity was when PMG received the EEOC complaint dated February 25, 2014.

On February 25, 2014 Mr. Olmeda filed a charge of national origin discrimination and retaliation with the EEOC; he alleged that he complained daily to supervisors and human resources, to no avail, and that, ultimately, Perez and Carrington followed him and shot at him.  He finally writes "I was fired in retaliation."[16]  The EEOC issued Olmeda a right to sue letter on June 11, 2014.

On August 20, 2014 Olmeda sued Cameron International Corporation; PMG, Inc. d/b/a a/k/a Personal Management Group d/b/a PMG; Billy Perez; and Scott Carrington.  Seeking declaratory, injunctive, and monetary relief, Olmeda initially purported to advance six causes of action, which he describes in the complaint as:

> (1) retaliation due to sexual[17] harassment, in violation of Title VII and negligent screening, hiring, and supervising; (2) unlawful discriminatory employment practices under Title VII and Louisiana state law; (3) lack of policy for racial harassment, discrimination and retaliation and violence in the workplace in violation of state law; (4) assault and battery [and] intentional

---

[16] On February 27, 2014 Mr. Olmeda alleges that he filed another charge with the EEOC (as well as with the Human Rights Commission), this time charging that he was fired in retaliation for complaining about employment discrimination.

[17] Presumably, the reference to "sexual" harassment is a typographical error in the complaint.

infliction [of emotional distress by] Dwight Caton; (5) compensatory and punitive damages under Title VII are allowed; (6) vicarious liability against ... Cameron and PMG ... strictly liable as joint tortfeasors in a common enterprise.[18]

Olmeda alleges that his employment was terminated the day after the shooting incident, even though he had never received any write-ups or negative performance evaluations. Cameron submits that it did not fire Olmeda, and PMG submits that Olmeda was not returned to his assignment with Cameron because, among other reasons, it could not protect him. On November 5, 2014, the Court granted in part[19] and denied in part PMG's motion to dismiss; Olmeda's claims against PMG for workplace harassment and retaliation survived the motion. Neither defendants Carrington nor Perez have filed any motions. Cameron and PMG now, separately, seek summary judgment dismissing Olmeda's claims against them. They also seek to strike certain evidence submitted by the plaintiff.

---

[18] Cameron and Olmeda do not dispute that the claims Olmeda is pursuing against it include: (1) vicarious liability for assault and battery under La. Civ. Code art. 2315 and 2320; (2) negligent screening, hiring, and supervision under La. Civ. Code art. 2315 and 2320; (3) intentional and negligent infliction of emotional distress; and (4) ethnic discrimination/harassment and retaliation under Title VII.

[19] As to PMG, the Court dismissed Olmeda's state law claims for assault, battery, and intentional infliction of emotional distress, and any other cause of action that is not a substantive cause of action.

I.

*A.*

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See <u>Matsushita Elec. Indus. Co. v. Zenith Radio.</u>, 475 U.S. 574, 586 (1986). A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. <u>See</u> <u>id</u>. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. <u>Id</u>. at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. <u>See</u> <u>Donaghey v. Ocean Drilling & Exploration Co.</u>, 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress

his claims.  Id.  Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.  Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); Fed. R. Civ. P. 56(c)(2).  "[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)(internal quotation marks and citation omitted).  In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).  Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013)(internal quotation marks and citation omitted).

*B.*

Cameron and PMG seek to confine the scope of the summary judgment record.  First, both point out that Olmeda's separate statement outlining his contested issue of genuine issues of material facts fails to comply with this Court's Local Rules.

In compliance with Local Rule 56.1, Cameron and PMG submitted separate statements of material facts as to which they contend

14

there is no genuine issue to be tried.  The plaintiff, however, submits a list of 43 facts that he alleges are genuinely disputed. This complies, in part, with Local Rule 56.2 (in that plaintiff submitted a statement of material facts as to which he contends there exists a genuine issue to be tried).  But the plaintiff fails to controvert all material facts in Cameron's and PMG's statements and, thus, those facts not controverted are deemed admitted for the purposes of the pending motions for summary judgment.  <u>See</u> Local Rule 56.2 ("[a]ll material facts set forth in the statement required to be served by the moving party will be deemed admitted, for the purposes of the motion, unless controverted as required by this rule.").

Second, both PMG and Cameron have filed objections and motions to strike certain evidence, including (1) the unsworn Thomas Bragg interview transcript; (2) Andy Olmeda's sworn affidavit; (3) Laura Hawkins' sworn affidavit; (4) all photographs; (5) all documents regarding the EEOC complaint; and (6) all documents submitted without proper foundation or containing hearsay or other inadmissible statements.

In resolving a motion for summary judgment, the Court "may only consider admissible evidence." <u>Coleman v. Jason Pharmaceuticals</u>, 540 Fed. Appx. 302, 306 (5th Cir. 2013)(citing Fed. R. Civ. P. 56(c)(2) and <u>Mersch v. City of Dallas</u>, 207 F.3d 732, 734-35 (5th Cir. 2000)).  Rule 56(c)(2) allows a party to

15

"object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

    1.  The Unsworn Bragg Telephone Interview Transcript

The plaintiff insists that Bragg's "testimony" is essential to the issues of whether Cameron supervisors were aware of "the horrific events" experienced by Olmeda and as to whether or not such conduct occurred during working hours.  Olmeda urges the Court to  deny the motions to strike this evidence because he is "trying to have him served for the July 6, 2015 phone/video deposition."[20] Insofar as Olmeda submits the unsigned, unsworn Bragg transcript to show the truth of the matter asserted by Bragg, it is inherently unreliable and is inadmissible hearsay (Federal Rule of Evidence 801(c)), for which plaintiff offers no exception; the plaintiff likewise fails even to suggest how the material can be presented in a form that would be admissible in evidence.[21]  The Court strikes the Bragg transcript from the summary judgment record and disregards it.

---

[20] Notably, notwithstanding plaintiff's failure to comply with Rule 56(d), the Court continued the submission date on both motions for summary judgment until one week after the scheduled deposition, but counsel for plaintiff has failed to file any additional papers suggesting that this deposition proceeded as scheduled. The Court declines the plaintiff's invitation to delay ruling on the pending motions.

[21] The Bragg transcript also contains double hearsay, which is inadmissible under Rule 805. Olmeda is required to show how each statement is not hearsay (or double hearsay) or how the statements are subject to a hearsay exception. He fails to do so.

2.  Plaintiff's Affidavit

Cameron and PMG object to Olmeda's post-deposition affidavit and seek to strike it from the summary judgment record.   They insist that Olmeda's affidavit contradicts his prior sworn deposition testimony without explanation.   Olmeda counters that his affidavit is admissible and that the Court cannot disregard it merely because it is self-serving.   The Court agrees that it may not disregard evidence merely because it is self-serving.   However, Olmeda's affidavit contains statements that contradict his prior deposition testimony.   He likewise fails to offer any explanation for the conflict; such statements will be disregarded insofar as they serve only to improperly manufacture a fact issue.

Affidavits filed in opposition to a motion for summary judgment may not be offered to contradict prior sworn testimony, without explanation.   McCulley v. JTM Industries, Inc., 116 F.3d 1477 (5th Cir. 1997)(unpublished, *per curiam*); Doe ex re. Doe v. Dallas Indep. Sch. District, 220 F.3d 380, 386 (5th Cir. 2000)(approving endorsement of the rule that "a plaintiff may not manufacture a genuine issue of material fact by submitting an affidavit that impeaches prior testimony without explanation").

There are clear contradictions between Olmeda's deposition testimony and the statements in his later, sworn affidavit. Defendants offer several examples. (1) Olmeda testified that the only person that used a racial slur was Scott Carrington; yet in

17

his affidavit, Olmeda states that he was "called a Beaner, a derogatory term of Mexican and subjected to racial slurs . . . on a daily basis by Thomas Bragg,. . . Scott Carrington, Billy Perez and numerous other employees." (2) Olmeda testified that Carrington made the "first" racial slur to him in the few days prior to the shooting (called a "f--king Mexican" at the boot sale truck) and that Carrington called him a "beaner" (derogatory for Mexican) after the "snorkel" incident in the days leading up to the shooting. But in his affidavit, Olmeda states that he complained to PMG about racial slurs from the first month of his employment at Cameron. (3) In his deposition, Olmeda testified that he did not tell the police anything about racial slurs during the investigation into the shooting incident; in his affidavit, he states he told the detectives about racial slurs. (4) Olmeda testified that he called PMG's Joe Coombs four times[22] in the week before the shooting, only left one message, and did not specifically state anything of substance in the message; yet in his affidavit, Olmeda states that he made several calls about racial slurs to Coombs since late June 2013 and that he left "messages" for Coombs.[23]

---

[22] Contrast this four times to Olmeda's statement in his affidavit that he called Coombs at least 25 times and never got an answer. PMG notes that Olmeda has failed to produce copies of his telephone records, disregarding PMG's request.

[23] This statement in his affidavit is also contradictory to another portion of his deposition testimony, wherein Olmeda

Cameron challenges other portions of Olmeda's affidavit on additional grounds of hearsay[24] and lack of personal knowledge. In support of its objection based on improper legal conclusions or lack of personal knowledge, Cameron challenges statements in Olmeda's affidavit in which he suggests that Billy Perez had threatened others in the past and was rehired by Cameron. Because Olmeda has not demonstrated his personal knowledge, the Court will disregard such statements. See Rule 56(c)(4) ("[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify.").

3.  Affidavit of Laura Hawkins

Olmeda submits a sworn affidavit of his girlfriend, Laura Hawkins. PMG and Cameron object to its consideration on the grounds that it contains multiple hearsay statements, contradicts his own deposition, lacks foundation, and otherwise fails to contain admissible evidence.[25] For the most part, the Court agrees.

---

testified that the first time Carrington made a racial comment to him was on September 11, after the "snorkel" incident.

[24] Cameron also submits that Olmeda's affidavit contains hearsay. Olmeda offers no argument in opposition to this specific challenge. Insofar as Olmeda recounts in his affidavit conversations he had with an unidentified supervisor and state criminal court judge, any such statements are inadmissible hearsay.

[25] Obviously, the Court does not take as fact Ms. Hawkins' description of Carrington and Perez as supervisors; she has not

Insofar Olmeda seeks to offer the content of many of Ms. Hawkins' statements as truthful, the Court will not consider those hearsay statements.  Some of what Ms. Hawkins swears to is that, in the days leading up to the shooting (and before then on dates that she does not remember), Olmeda called her, asking her to call Coombs to complain that Olmeda was being called "a Beaner and Spic, fat ass Mexican, and a dumb ass Beaner;"[26] she says that she left messages, but she never heard back from Coombs.  That Hawkins swears that she left messages for Coombs is proper summary judgment evidence.[27]

4.  Challenges to Other Evidence

Insofar as the defendants challenge the admissibility of photographs and other evidence, the plaintiff has failed to respond to these objections.  The defendants' objections are therefore sustained as unopposed and because, as submitted, these exhibits indeed lack foundation.  The Court disregards this other evidence, which is listed in the defendants' papers.  The Court notes that the plaintiff does not appear to rely on this evidence; of course,

_____

demonstrated any foundation for knowledge as to supervisory positions at her boyfriend's workplace.

[26] If Olmeda seeks to offer Hawkins' statements to establish that, in truth and in fact, Olmeda was called derogatory names, Olmeda may not do so on hearsay grounds.

[27] It seems that the defendants are entitled to the plaintiff's and Hawkins' telephone records. The Court sees no reason why the defendants have not filed a motion to compel these records.

the Court would not be tasked with considering any materials that are not cited in the papers.  See Fed. R. Civ. P. 56(c)(3).

II.

Olmeda alleges two Title VII claims against each of PMG and Cameron: hostile work environment and retaliation.

*A.*

PMG and Cameron seek judgment as a matter of law dismissing the plaintiff's Title VII hostile work environment claim.[28]

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

To establish a race or national origin-based hostile work environment claim, a plaintiff must prove that:  (i) he belongs to a protected class; (ii) he was subjected to unwelcome harassment; (iii) the harassment was based on his race or national origin; (iv)

---

[28] Initially, Cameron also moved for summary judgment dismissing Olmeda's Title VII race/ethnic discrimination claim. Olmeda does not oppose, presumably because he seeks to recover only under hostile work environment and retaliation theories.  Even assuming Olmeda was pursuing a Title VII discrimination claim against Cameron, the Court finds that Cameron is entitled to judgment as a matter of law because Olmeda cannot prove the fourth element of his prima facie case.  There is no evidence in the record establishing that Olmeda was replaced by a person outside of the protected class, or that he was treated less favorably than similarly situated employees of a different ethnicity.  Merritt v. United Parcel Service, 321 Fed. Appx. 410, 413-14 (5th Cir. 2009).

21

the harassment affected a "term, condition, or privilege of her employment"; and (v) his employer knew or should have known of the harassment and failed to take prompt, remedial action.  Hockman v. Westward Communications, LLC, 407 F.3d 317, 325 (5th Cir. 2004); Frank v. Xerox Corp., 347 F.3d 130, 138 (5th Cir. 2003).

To determine whether a hostile work environment exists, in particular whether the harassment affects a term or privilege of employment, the Court applies a totality-of-the-circumstances test that focuses on "the frequency of the discriminatory conduct; its severity; and whether it unreasonably interferes with an employee's work performance." Turner v. Baylor Richardson Medical Center, 476 F.3d 337, 347 (5th Cir. 2007)(citing Walker v. Thompson, 214 F.3d 615, 625 (5th Cir. 2000)(quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993)).  Although "[d]iscriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive" to support evidence of a Title VII violation, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory charges" that can survive summary judgment. See id. at 347-48 (citations omitted); see also Meritor Savings Bank v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)("mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" is insufficient to affect the conditions of employment to a sufficiently significant degree to violate Title

VII).

Cameron and PMG challenge Olmeda's ability to establish the fourth element of the prima facie harassment claim. To satisfy the fourth element -- whether the harassment affected a term or condition of employment -- racial or national origin harassment "must be sufficiently severe *or* pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. at 67 (emphasis added).[29] Courts take into account the totality of the circumstances, and the challenged conduct must be both objectively and subjectively offensive. <u>Shepherd v. Comptroller of Pub. Accounts</u>, 168 F.3d 871, 874 (5th Cir. 1999) (citing <u>Harris v. Forklift</u>, 510 U.S. 17, 21-22 (1993)).

Olmeda relies on a few incidents of harassing conduct. He

---

[29] The Fifth Circuit has recognized that:

> [a]n egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment. The inverse is also true: Frequent incidents of harassment, though not severe, can reach the level of pervasive, thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists. Thus, the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct.

<u>Lauderdale v. Tex. Dep't of Crim. Justice</u>, 512 F.3d 157, 163 (5th Cir. 2007).

submits that in the days leading up to the shooting, Carrington for the first time called Olmeda "f--king dumba-- mother f--ker" or he may have "told me to get the fuck out of the way, fucking Mexican or something like that." Olmeda submits that Carrington also called him "Beaner."  Placing these comments in context, before these comments were made, Olmeda was singled out for being a "snorkel", or suck-up.  But Olmeda does not contend that the snorkel incident or other profanity exchanges he had with Carrington occurred because of his Hispanic descent.  Indeed, the record is clear that Olmeda did not report to Cameron or PMG (or even the police investigator) that he was being targeted and harassed due to his race or national origin, although he did report that Carrington had threatened him.[30]

To survive summary judgment, the harassment must be "so severe [or] pervasive that it destroys a protected classmember's opportunity to succeed in the workplace."  Shepherd, 168 F.3d at 874.  "The alleged conduct must be more than rude or offensive comments, teasing, or isolated incidents."  Hockman v. Westward Communications, LLC, 407 F.3d 317 (5th Cir. 2004) (citing Shepherd, 168 F.3d at 874); Lauderdale v. Tex. Dep't of Criminal Justice, 512 F.3d 157, 163 (5th Cir. 2007)(quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662

---

[30] Olmeda fails to direct the Court to any evidence that would, or in which he had, linked any threatening comment by Carrington to his protected status.

(1998)("Title VII ... is not a 'general civility code,' and 'simple teasing,' off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'").

Here, the few incidents in a weeklong period at the end of his four-month long temporary placement (while rude, unprofessional, and in poor taste) were hardly frequent, flagrant, physically threatening, or humiliating and, therefore, do not rationally rise to the level or degree of severity or pervasiveness necessary to maintain a hostile work environment claim under the law. See Turner, 476 F.3d at 348 (plaintiff introduced insufficient evidence that hostile work environment existed based on supervisor's "ghetto children" comments, university night school comment, and comments related to plaintiff's shopping habits, car, and son's hobby because such comments were isolated and ceased upon plaintiff's request). Further, these infrequent comments pale in comparison to far more severe race-based comments that have been found to support hostile work environment claims. See, e.g., Walker v. Thompson, 214 F.3d 615, 625 (5th Cir. 2000)(holding that plaintiff survives summary judgment where evidence demonstrated years of inflammatory racial epithets, including "nigger" and "little black monkey"); Daniels v. Essex Group, Inc., 937 F.2d 1264, 1266 (7th Cir. 1991)(finding summary judgment for defendant inappropriate where plaintiff was subjected to "nigger jokes" for a ten-year period and

whose workstation was adorned with "a human-sized dummy with a black head"); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 182 (4th Cir. 2001)(reversing summary judgment where plaintiff suffered "incessant racial slurs" including "nigger" and "dumb monkey"); cf. Pickens v. Shell Tech. Ventures, Inc., 118 Fed.Appx. 842, 850 (5th Cir. 2004)(unpublished)(holding that a company Christmas party where a skit with characters in blackface was performed and racially insensitive comments were made did not create a hostile work environment); Mosley v. Marion County, Miss., 111 Fed.Appx. 726, 728 (5th Cir. 2004)(unpublished)(three incidents involving the use of racial slurs were insufficient to establish a hostile work environment claim). And, importantly, Olmeda himself has submitted no evidence to suggest that the infrequent off-hand remarks, one of which was made while waiting in line to buy boots at a truck outside of the shop, affected his work performance. Although the record supports a finding that perhaps the Berwick facility is permeated by profanity, Title VII is not a civility code. No genuine issue of material fact exists as to whether Carrington's "Mexican" and "Beaner" comments affected a term or condition of the plaintiff's employment.[31]

The Court finds summary judgment dismissing the plaintiff's

_____

[31]   As to PMG, it is undisputed that no PMG employees harassed Olmeda. Nor did PMG control Cameron's work site. Any harassment claim against PMG fails as a matter of law for this additional reason.

Title VII hostile work environment claim is appropriate on this basis alone.[32]  Nevertheless, even if the Court determined that a genuine dispute concerning a material fact precluded summary judgment on the fourth element (that is, if the Court considered the shooting to be a race-based workplace incident, which is belied by the record), PMG and Cameron remain entitled to summary judgment.  Olmeda cannot demonstrate how either Cameron or PMG knew or should have known of the harassing conduct and failed to take prompt remedial action.  Carrington and Perez were fired within days of the shooting and within a week of any derogatory comment made by Carrington, as they should have been.

The Supreme Court has distinguished between cases in which a hostile work environment is created by the plaintiff's co-workers and cases in which it is created by the plaintiff's supervisor.  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998); Aryain v. Wal-Mart Stores Texas LP, 534 F.3d 473, 479 n.4 (5th Cir. 2008).  PMG submits that neither Perez nor Carrington were supervisors within the meaning of Title VII.[33]  The Court agrees.  See Vance v.

_____

[32] Olmeda understandably focuses on the outrageous and severe conduct of Carrington and Perez in carrying out their drunken highway shooting.  The Court does not minimize the severity of this incident.  However, Olmeda fails to demonstrate how this episode could be considered as part of the workplace that Title VII seeks to regulate.  Olmeda cites no case literature in support of his theory that this intentional criminal conduct perpetuated by co-workers after hours and off premises triggers Title VII.

[33] Although Olmeda disputes this fact, the dispute is not genuine.  The only evidence in the record on this issue supports a

Ball State Univ., 133 S Ct. 2434, 2443 (2013); see also Cheshewalla v. Rand & Son Constr. Co., 415 F.3d 847 (8th Cir. 2005)(finding that foreman over construction laborers was "co-worker," not "supervisor"); Ochoa v. Texas Metal Trades Council, 989 F. Supp. 828, 829 (S.D. Tex. 1997)("The function of the Leadman is primarily to distribute work to fellow employees.  The Leadman is not a member of management.").  Accordingly, the employer may be liable for harassment by co-workers only if it "knew or should have known of the harassment in question and failed to take prompt remedial action." Stewart v. Mississippi Transp. Comm'n, 586 F.3d 321, 330 (5th Cir. 2009).  Cameron took prompt remedial action by immediately terminating Carrington and Perez following the shooting incident and, relative to any uncivil exchanges in the workplace, less than a week after Carrington made any "racial" comments to Olmeda.[34]

---

finding that neither Perez nor Carrington were supervisors. Although Perez was nominally "lead man," he was no manager. There is no evidence in the record that would support a finding that either individual defendant was empowered to take tangible employment action against Olmeda.

[34] That PMG could not fire the perpetrators (given that Carrington and Perez were Cameron employees) does not support a finding that PMG did not take prompt, remedial action. The plaintiff fails to provide any case law to support any theory that PMG failed to take prompt remedial action. (Cameron did it for both employers).  In any event, it is noteworthy that PMG pulled Olmeda's placement immediately, at least in part due to safety concerns for its temporary employee.  Although this is the source of Olmeda's retaliation claim, Olmeda cannot prove his prima facie case of hostile work environment against either PMG or Cameron.

Accordingly, the plaintiff's race or national origin-based hostile work environment claims are hereby dismissed.

*B.*

Olmeda charges that PMG and Cameron unlawfully retaliated against him based upon his complaints regarding a racially hostile work environment.  PMG and Cameron, separately, move for summary judgment dismissing Olmeda's retaliation claim because he cannot prove his prima facie case.  The Court agrees.

Under Title VII, "an employer may not discriminate against an employee because the employee has 'opposed any practice made an unlawful employment practice ... or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII."  See LeMaire v. La. Dep't of Transp. & Dev., 480 F.3d 383, 388 (5th Cir. 2007)(omission in original)(quoting 42 U.S.C. § 2000e-3).

Like employment discrimination claims, retaliation claims are governed by the McDonnell Douglas burden-shifting framework.  Id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).  Under that framework, an employee must first establish a prima facie case of retaliation by showing that: (1) he engaged in a protected activity; (2) that his employer took an adverse employment action; and (3) that a causal link exists between the protected activity and the adverse employment action.  McCoy v. City of Shreveport, 492 F.3d 551, 556-57 (5th

Cir. 2007).   If the employee makes such a showing, the familiar burden-shifting framework identified above applies: the employer must articulate legitimate, non-discriminatory reasons for its employment action and then, if articulated, the burden shifts back to the employee to show that the employer's proffered reasons are a pretext for its actual retaliatory purpose.   See id.

Cameron and PMG submit that Olmeda cannot demonstrate that he engaged in protected activity.   The Court agrees.[35]   There is no evidence in the record that Olmeda complained to anyone at Cameron that he had been the target of race or national origin discrimination or harassment.[36]   The only evidence that PMG was on notice that Olmeda was being harassed due to his race or national origin is submitted in the Hawkins affidavit.[37]   Ms. Hawkins swears that she left messages for PMG's Joe Coombs in the days leading up

---

[35] It is also noteworthy that there is no link to the EEOC complaint, which was not lodged until months after the shooting.

[36] The record demonstrates that Olmeda complained about the snorkel incident, which he concedes has nothing to do with race or national origin.   Olmeda also notified Cameron that Carrington had threatened him; again, however, there is no evidence in the record indicating that Olmeda advised Cameron that there was any racial component to his exchanges with Carrington.

[37] The Court must view this in the light most favorable to the plaintiff and, therefore, assumes for the purposes of this motion that Hawkins left voicemails for Coombs alerting him to her boyfriend's alleged harassment in the days leading up to the shooting.   Coombs of course disputes this and there is other evidence in the record that contradicts this submitted fact.   The Court observes that the defendant would be entitled to discover Ms. Hawkins' phone records to assist a jury in resolving the fact dispute.

to the shooting.  Even assuming that a fact issue is raised as to whether Hawkins' complaints on behalf of her boyfriend constitute Olmeda engaging in protected activity, his retaliation claim against PMG nevertheless fails.

There is no evidence in the record supporting the third element of Olmeda's prima facie retaliation element.  Olmeda wholly fails to demonstrate a causal link between any protected activity and the adverse employment action.  As for Cameron, there is no dispute that Cameron did not "fire" Olmeda; PMG pulled his temporary placement.  And assuming that pulling a temporary lended employee's placement constitutes adverse employment action, there is no evidence in the record linking this action to Olmeda's voicemail complaints through his girlfriend to his PMG recruiter (that he was being called racist names).  Rather, there is no dispute that PMG pulled Olmeda's placement because it could not assure his safety and due to character issues that had manifested themselves at a prior job and at Cameron.[38]

### III.

Finally, Cameron and PMG seek summary judgment dismissing the plaintiff's state law claims.

### A.

Cameron seeks summary judgment dismissing the plaintiff's

---

[38] Notably, Olmeda initially told Coombs that he did not want to return to the job site for fear of his safety.

vicarious liability for assault and battery claim; negligent screening, hiring, and supervision claim; and intentional and negligent infliction of emotional distress claim.

1.  Vicarious Liability

Olmeda alleges that Cameron is vicariously liable for the actions of its supervisory employees in the workplace.  Insofar as Olmeda asserts that Cameron is liable for the assault and battery committed by Carrington and Perez, Cameron submits that Louisiana law is clear that such intentional acts are not withing the course and scope of employment and, therefore, it is not vicariously liable under La. Civ. Code articles 2315 and 2320.   The Court agrees.

An employer is liable for the torts of an employee committed while the employee is acting within the course and scope of his employment.  La. Civ. Code art. 2320.  "Vicarious liability rests in a deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities." Richard v. Hall, 874 So.2d 131, 138 (La. 2004).  An employer's vicarious liability for conduct which is not its own extends only to the employee's tortious conduct that is within the course and scope of employment. Kelly v. Dyson, 40 So.3d 1100, 1105 (La. App. 5 Cir. 5/25/10). "Course" refers to the time and place that the conduct occurred, while "scope" examines the employment-related risk of injury.

Baumeister v. Plunkett, 673 So.2d 994, 996 (La. 1996).

In Baumeister, the Louisiana Supreme Court held that the court of appeals erred in holding a hospital liable for the sexual battery committed by one of its nursing supervisors on a co-employee during working hours on the hospital's premises.  Id. at 999.  In so holding, the state supreme court embraced a four-part test for vicarious liability: (1) whether the tortious act was primarily employment rooted; (2) whether the act was reasonably incidental to the performance of the employee's duties; (3) whether the act occurred on the employer's premises; and (4) whether the act occurred during the hours of employment.  Id. at 996-97 (citation omitted).  Finding that (3) and (4) were met, but not (1) and (2), the state supreme court concluded that the "sexual assault was entirely extraneous to [the] employer's interests."  Id. at 1000.

Applying these principles to the facts here compels the same result.  The Court finds that Cameron had no duty to protect Olmeda from intentional acts committed by co-employees after hours and off premises; a drive-by highway shooting after hours of drinking at private establishments was not reasonably incidental to Carrington's and Perez's official work-related duties as machinists.[39]  Olmeda's vicarious liability claim borders on

---

[39] Accord Kelley v. Dyson, 40 So.3d 1100 (La. App. 5 Cir. 5/25/10)(dismissing vicarious liability and negligence claims brought by worker who, after several fights at work, was assaulted

frivilous; summary judgment is warranted.

2.  Negligent screening, hiring, and supervision

Cameron submits that it is entitled to summary judgment dismissing the plaintiff's negligence claims because (a) negligence claims are precluded by Louisiana's worker's compensation regime; (b) Cameron owed no duty to Olmeda; or (c) the individual defendants' intoxicated condition was the cause in fact of the plaintiff's harm.  Olmeda counters that the workers compensation bar does not apply when supervisory employees engage in intentional conduct; that Cameron owed Olmeda a duty to protect him; that intoxication does not preclude liability; and that Cameron, through Cardinale, was negligent in failing to ensure Olmeda's safety and the breach of that duty "resulted in Olmeda's attack and nearly resulted in his death."

Under the Louisiana Worker's Compensation Act, La.R.S. 23:1032, an injured employee is limited to the remedies available under the Act.  La.R.S. 23:1032(A)(1)(a).  A borrowed employee is barred from bringing a negligence action against either his general or borrowing employer.  Sanchez v. Harbor Constr. Co., Inc., 968 So.2d 783, 787 (La. App. 4 Cir. 10/3/07).

Olmeda does not dispute that he was Cameron's borrowed employee.  Rather, he argues that intentional tortious acts of

---

by co-worker, who used a steel toed boot to kick and break the plaintiff's ankle).

34

supervisors are excepted from the Act's exclusivity provisions; he invokes La.R.S. 23:1032(B), which provides: "Nothing in this Chapter shall affect the liability of the employer . . . resulting from an intentional act."[40]   He provides no support for his argument; he fails to suggest how his *negligence* claims against Cameron survive the exclusivity provisions of the Act.   La.R.S. 23:1032(A).

Even if his negligence claims against Cameron survived the exclusivity bar, Olmeda's negligence claims would nevertheless fail for two separate reasons.   First, the Court finds as a matter of law that Cameron had no duty under the circumstances.   Second, Carrington's and Perez's own intentional conduct getting drunk, retrieving a shotgun, and shooting at Olmeda while driving, was the cause-in-fact of Olmeda's harm.

La. C.C. art. 2315 provides: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."   In other words, in negligence cases, where circumstances create a duty to do so, the defendant must use reasonable care so as to avoid injuring another person.   Louisiana courts have adopted a duty-risk analysis in determining whether to

---

[40] To satisfy the requirements of the intentional act exception, by definition, the alleged conduct must go beyond gross negligence or mere failure to maintain safe conditions at work. Bazley v. Tortorich, 397 So.2d 475, 480 (La. 1981)(intentional in this context means that "the defendant either desired to bring about the physical results of his act or believed they were substantially certain to follow from what he did.").

impose liability under the general negligence principles of La. C.C. art. 2315.   To recover, the plaintiff must prove that (1) Cameron had a duty to conform its conduct to a specific standard (the duty element); (2) Cameron's conduct failed to conform to the appropriate standard (the breach element); (3) Cameron's substandard conduct was a cause-in-fact of his injuries (the cause-in-fact element); (4) Cameron's substandard conduct was a legal cause of the injuries (the scope of protection element); and (5) he suffered damages (the damages element).   See Bridgefield Cas. Ins. Co. v. J.E.S., Inc., 29 So.3d 570, 573 (La.App. 1 Cir. 10/23/09)(citations omitted).   "[A]ll four inquiries must be affirmatively answered for plaintiff to recover." Jiminez v. Omni Royal Orleans Hotel, 66 So.3d 528, 532 (La.App. 4 Cir. 5/18/11)(citation omitted).   "Whether a duty is owed is a question of law; whether defendant has breached a duty is a question of fact." Brewer v. J.B. Hunt Transport, Inc., 35 So.3d 230, 240 (La. 2010).   A claim against an employer for the torts of an employee based on the employer's alleged direct negligence in hiring, retaining, or supervising the employee is governed by the same duty-risk analysis. Griffin v. Kmart Corp., 776 So.2d 1226, 1231 (La.App. 5 Cir. 11/28/00).   When an employer hires an employee who in the performance of his duties will have a "unique opportunity" to commit a tort against a third party, he has a duty to exercise reasonable care in the selection of that employee.   Id.

Here, Olmeda has not alleged, let alone submitted evidence indicating, that employment by Cameron gave Carrington or Perez a unique opportunity to inflict harm on Olmeda.  There is nothing in the record to support imposing a duty on Cameron to protect Olmeda on the weekend and away from the facility and certainly not from a highway drive-by shooting. See Kelley v. Dyson, 40 So.3d 1100 (La. App. 5 Cir. 5/25/10).

Finally, the record supports a finding that no conduct on the part of Cameron could credibly be considered a substantial factor in bringing about the harm to Olmeda; rather, the drunken shooting perpetrated by Carrington and Perez is certainly an independent, intervening act.  See, e.g., Perkins v. Entergy Corp., 782 So.2d 606, 611 (La. 2001); Fabre v. B.F. Goodrich Co., 218 So.2d 617, 620 (La. App. 4 Cir. 1969).

3.  Intentional Infliction of Emotional Distress

To recover on an intentional infliction of emotional distress claim in Louisiana, a plaintiff is required to show that (1) the defendant's conduct was extreme and outrageous; (2) the plaintiff suffered severe emotional distress; and (3) "the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." White v. Monsanto Co., 585 So. 2d 1205, 1209 (La. 1991).  The conduct requirement in an IIED claim is difficult for a plaintiff to meet; the standard does not reach "mere insults,

indignities, threats, annoyances, petty oppressions, or other trivialities," but, rather, the behavior must "go beyond all possible bounds of decency, [and must] be regarded as atrocious and utterly intolerable in a civilized community." Id.; see also Iturralde v. Shaw Grp., Inc., 512 Fed. Appx. 430, 435 (5th Cir. 2013) ("Under Louisiana Civil Code Article 2315, plaintiffs must meet a high burden of proof to prevail on an IIED claim."). "Unlike an action grounded in negligence, an action sounding in intentional tort causes us to focus on whether the employer desired or knew that the harm facing the plaintiff as a result of the complained-of conduct was substantially certain to result from the conduct." Bourgeois v. Curry, 921 So.2d 1001, 1010 (La. App. 4 Cir. 12/14/05).

Cameron submits that there is no evidence as to the third element. The Court agrees. There is no evidence in the record supporting an IIED claim against Cameron and certainly none demonstrating that Cameron knew or desired that the harm facing Olmeda would be substantially certain to result from its conduct.[41]

Accordingly, Cameron is entitled to summary relief on the plaintiff's state law claims.

––––––––––––––––––––

[41] All the plaintiff offers in support of his IIED claim against Cameron is "[c]ertainly be shot at with a shotgun with buckshot and deflating a tire as well as causing loss of control of Olmeda's truck is a traumatic event when you fear death." Olmeda fails to link this episode to Cameron.

*B.*

The Court previously dismissed Olmeda's claims against PMG for assault, battery, intentional infliction of emotional distress, and vicarious strict liability. PMG now seeks summary judgment dismissing the plaintiff's claim for negligent screening, hiring, and supervising and his state discrimination claim under La.R.S. 23:301. The plaintiff has failed to submit any argument in opposition, apparently abandoning any remaining state law claims against PMG. Even so, the Court finds that PMG is entitled to judgment as a matter of law dismissing these claims. Without the benefit of briefing by the plaintiff, his negligent hiring claim against PMG is barred by the Louisiana Worker's Compensation Act. Benoit v. Turner Industries Group, L.L.C., 85 So.3d 629, 634 (La. 2012) ("the workers compensation regime represents a quid pro quo compromise of interests, whereby 'the employee receive[s] an absolute right to recover limited benefits in exchange for the employer's tort immunity.'"). Even if not, the record is clear that PMG did not hire, supervise, or train either Carrington or Perez (or otherwise have any presence on site at the Berwick facility) such that the grounds for a negligence claim against PMG is completely lacking. As to any claim the plaintiff might have been pursuing under Louisiana's employment discrimination law, La.R.S. 23:301, it fails as a matter of law because the record confirms that PMG did not employee 20 or more employees within the

state of Louisiana for each working day in each of 20 or more calendar weeks in any year.[42]

Accordingly, IT IS ORDERED: that Cameron's motion to strike is hereby GRANTED in part and DENIED in part, and its motion for summary judgment is hereby GRANTED.  IT IS FURTHER ORDERED: that PMG's motion to strike is hereby GRANTED in part and DENIED in part, and its motion for summary judgment is hereby GRANTED.  The plaintiff's claims against Cameron and PMG are dismissed.  Finally, IT IS ORDERED: that the Court declines to exercise supplemental jurisdiction over the plaintiff's remaining, ostensibly state law causes of action against the individual defendants.[43]  See 28 U.S.C. § 1367; the plaintiff's claims against Perez and Carrington are dismissed without prejudice.

New Orleans, Louisiana, July 13, 2015

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[42] Moreover, the record evidence indicates that PMG and Cameron were not related entities that shared control of labor.

[43] The Court has nothing before it addressing which causes of action remain against the individual defendants.  It is difficult to glean from the complaint which causes of action remain pending against the individual defendants.  There appear to be assault and battery causes of action and perhaps a cause of action for intentional infliction of emotional distress against Perez and Carrington.